JOHN HARVEY NELSON v. DARYL DEAN C. FREELAND AND
BELINDA BRITTAIN FREELAND

No. 216A98

(Filed 31 December 1998)

## Negligence § 105 (NCI4th)— premises liability—invitee and licensee distinction—abolished

The distinction between licensees and invitees is eliminated and a standard of reasonable care toward all lawful visitors is adopted. Adoption of a true negligence standard eliminates the complex, confusing, and unpredictable state of premises-liability law and replaces it with a rule which focuses the jury's attention upon the pertinent issue of whether the landowner acted as a reasonable person under the circumstances. The duty imposed upon owners and occupiers of land is only the duty to exercise a reasonable care in the maintenance of the premises for the protection of lawful visitors; owners and occupiers of land are not now insurers of their premises and the intent is not for owners and occupiers of land to undergo unwarranted burdens in maintaining their premises. It is further emphasized that a separate classification for trespassers is maintained. This rule is given prospective and retroactive application.

Chief Justice MITCHELL concurring in the result.

Justices LAKE and ORR join in this concurring opinion.

Appeal of right by plaintiff pursuant to N.C.G.S. § 7A-30(2) from an unpublished decision of a divided panel of the Court of Appeals, 129 N.C. App. 427, 500 S.E.2d 778 (1998), affirming an order granting defendants' motion for summary judgment entered by Burke, J., on 15 July 1997 in Superior Court, Guilford County. Heard in the Supreme Court 16 November 1998.

*Maddox & Gorham, P.A., by E. Thomas Maddox, Jr.; and Harrison, North, Cooke & Landreth, by A. Wayland Cooke, for plaintiff-appellant.*

*Burton & Sue, L.L.P., by Walter K. Burton, David K. Williams, Jr., and James D. Secor, III, for defendant-appellees.*

NELSON v. FREELAND

[349 N.C. 615 (1998)]

WYNN, Justice.

The sole issue arising out of the case *sub judice* is whether defendant Dean Freeland's ("Freeland") act of leaving a stick on his porch constituted negligence. Indeed, this case presents us with the simplest of factual scenarios—Freeland requested that plaintiff John Harvey Nelson ("Nelson") pick him up at his house for a business meeting the two were attending, and Nelson, while doing so, tripped over a stick that Freeland had inadvertently left lying on his porch. Nelson brought this action against Freeland and his wife seeking damages for the injuries he sustained in the fall. The trial court granted summary judgment for the defendants, and the Court of Appeals affirmed. *See Nelson v. Freeland*, 129 N.C. App. 427, 500 S.E.2d 778 (1998).

Although the most basic principles of tort law should provide an easy answer to this case, our current premises-liability trichotomy—that is, the invitee, licensee, and trespasser classifications—provides no clear solution and has created dissension and confusion amongst the attorneys and judges involved. Thus, once again, this Court confronts the problem of clarifying our enigmatic premises-liability scheme—a problem that we have addressed over fourteen times. *See, e.g., Cassell v. Collins*, 344 N.C. 160, 472 S.E.2d 770 (1996); *Newton v. New Hanover County Bd. of Educ.*, 342 N.C. 554, 467 S.E.2d 58 (1996); *Roumillat v. Simplistic Enters.*, 331 N.C. 57, 414 S.E.2d 339 (1992); *Pulley v. Rex Hosp.*, 326 N.C. 701, 392 S.E.2d 380 (1990); *Branks v. Kern*, 320 N.C. 621, 359 S.E.2d 780 (1987); *Mazzacco v. Purcell*, 303 N.C. 493, 279 S.E.2d 583 (1981); *Norwood v. Sherman-Williams Co.*, 303 N.C. 462, 279 S.E.2d 559 (1981); *Rappaport v. Days Inn of Am., Inc.*, 296 N.C. 382, 250 S.E.2d 245 (1979); *Husketh v. Convenient Sys., Inc.*, 295 N.C. 459, 245 S.E.2d 507 (1978); *Anderson v. Butler*, 284 N.C. 723, 202 S.E.2d 585 (1974); *Freeze v. Congleton*, 276 N.C. 178, 171 S.E.2d 424 (1970); *Game v. Charles Stores Co.*, 268 N.C. 676, 151 S.E.2d 560 (1966); *Thames v. Nello L. Teer Co.*, 267 N.C. 565, 148 S.E.2d 527 (1966); *Jones v. Kinston Hous. Auth.*, 262 N.C. 604, 138 S.E.2d 235 (1964).

As the aforementioned cases demonstrate, we have repeatedly waded through the mire of North Carolina premises-liability law. Nonetheless, despite our numerous attempts to clarify this liability scheme and transform it into a system capable of guiding North Carolina landowners toward appropriate conduct, this case and its similarly situated predecessors convincingly demonstrate that our current premises-liability scheme has failed to establish a stable and

predictable system of laws. Significantly, despite over one hundred years of utilizing the common-law trichotomy, we still are unable to determine unquestionably whether a man who trips over a stick at a friend/business partner's house is entitled to a jury trial—a question ostensibly answerable by the most basic tenet and duty under tort law: the reasonable-person standard of care.

Given that our current premises-liability scheme has confounded our judiciary, we can only assume that it has inadequately apprised landowners of their respective duties of care. Thus, it befalls us to examine the continuing utility of the common-law trichotomy as a means of determining landowner liability in North Carolina. In analyzing this question, we will consider the effectiveness of our current scheme of premises-liability law, the nationwide trend of abandoning the common-law trichotomy in favor of a reasonable-care standard, and the policy reasons for and against abandoning the trichotomy in this state.

## I. ANALYSIS

### A. CURRENT NORTH CAROLINA PREMISES-LIABILITY LAW

Under current North Carolina law, the standard of care a landowner[1] owes to persons entering upon his land depends upon the entrant's status, that is, whether the entrant is a licensee, invitee, or trespasser. *See Newton*, 342 N.C. at 560, 467 S.E.2d at 63. An invitee is one who goes onto another's premises in response to an express or implied invitation and does so for the mutual benefit of both the owner and himself. *Id.* The classic example of an invitee is a store customer. *See, e.g., Rives v. Great Atl. & Pac. Tea Co.*, 68 N.C. App. 594, 315 S.E.2d 724 (1984). A licensee, on the other hand, "is one who enters onto another's premises with the possessor's permission, express or implied, solely for his own purposes rather than the possessor's benefit." *Mazzacco*, 303 N.C. at 497, 279 S.E.2d at 586-87. The classic example of a licensee is a social guest. *See, e.g., Crane v. Caldwell*, 113 N.C. App. 362, 366, 438 S.E.2d 449, 452 (1994). Lastly, a trespasser is one who enters another's premises without permission or other right. *See Newton*, 342 N.C. at 559, 467 S.E.2d at 63.

In a traditional common-law premises-liability action, the threshold issue of determining the plaintiff's status at the time of the injury is of substantial import. The gravity of this determination stems from

---

1. We note that the term "landowner" as used in this opinion refers to both owners and occupiers of land.

NELSON v. FREELAND

[349 N.C. 615 (1998)]

the fact that there is a descending degree of duty owed by a landowner based upon the plaintiff's status. *Id.* at 561, 467 S.E.2d at 63.

The highest degree of care a landowner owes is the duty of reasonable care toward those entrants classified as invitees. *See Roumillat,* 331 N.C. at 64, 414 S.E.2d at 342. Specifically, a landowner owes an invitee a duty to use ordinary care to keep his property reasonably safe and to warn of hidden perils or unsafe conditions that could be discovered by reasonable inspection and supervision. *See Pulley,* 326 N.C. at 705, 392 S.E.2d at 383.

A landowner's duty toward a licensee, on the other hand, is significantly less stringent. The duty of care owed to a licensee by an owner or possessor of land ordinarily is to refrain from doing the licensee willful injury and from wantonly and recklessly exposing him to danger. *McCurry,* 90 N.C. App. at 645, 369 S.E.2d at 392. Thus, a licensee enters another's premises at his own risk and enjoys the license subject to its concomitant perils. *See Turpin v. Our Lady of Mercy Catholic Church,* 20 N.C. App. 580, 583, 202 S.E.2d 351, 353 (1974).

Finally, with respect to trespassers, a landowner need only refrain from the willful or wanton infliction of injury. *See Bell v. Page,* 271 N.C. 396, 156 S.E.2d 711 (1967). Willful injury constitutes actual knowledge of the danger combined with a design, purpose, or intent to do wrong and inflict injury. *See Howard v. Jackson,* 120 N.C. App. 243, 246, 461 S.E.2d 793, 797 (1995). Similarly, a wanton act is performed intentionally with a reckless indifference to the injuries likely to result. *Id.*

B. PREMISES-LIABILITY NATIONWIDE—THE MODERN TREND
OF ABOLISHING THE COMMON-LAW TRICHOTOMY
IN FAVOR OF A REASONABLE-PERSON STANDARD

Although the common-law trichotomy has been entrenched in this country's tort-liability jurisprudence since our nation's inception, over the past fifty years, many states have questioned, modified, and even abolished it after analyzing its utility in modern times. At first, states believed that although the policies underlying the trichotomy—specifically those involving the supremacy of land ownership rights—were no longer viable, they nonetheless could find means to salvage it. *See Jones v. Hansen,* 254 Kan. 499, 505-06, 867 P.2d 303, 307-08 (1994); *Heins v. Webster County,* 250 Neb. 750, 757-58, 552 N.W.2d 51, 55-56 (1996). In particular, states attempted to

salvage the trichotomy by engrafting into it certain exceptions and subclassifications which would allow it to better congeal with our present-day policy of balancing land-ownership rights with the right of entrants to receive adequate protection from harm. *See Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630-31, 3 L. Ed. 2d 550, 554-55 (1959); *Heins*, 250 Neb. at 757-58, 552 N.W.2d at 55-56. Accordingly, North Carolina, along with the rest of the country, witnessed the burgeoning of novel jurisprudence involving entrant-protection theories such as the active-negligence and attractive-nuisance doctrines. *See* Michael Sears, *Abrogation of the Traditional Common Law of Premises Liability*, 44 U. Kan. L. Rev. 175, 179 (1995); *see also Fitch v. Selwyn Village*, 234 N.C. 632, 634, 68 S.E.2d 255, 257 (1951) (discussing attractive-nuisance doctrine); *DeHaven v. Hoskins*, 95 N.C. App. 397, 400, 382 S.E.2d 856, 858 (discussing active-negligence doctrine), *disc. rev. denied*, 325 N.C. 705, 338 S.E.2d 452 (1989). Unfortunately, these exceptions and subclassifications ultimately forced courts to maneuver their way through a dizzying array of factual nuances and delineations. *See Kermarec*, 358 U.S. at 631, 3 L. Ed. 2d at 555 (stating "the classification and subclassification bred by the common law have produced confusion and conflict"); *Smith v. Arbaugh's Restaurant, Inc.*, 469 F.2d 97, 103 (D.C. Cir. 1972) (stating that the exceptions and subclassifications have "produced even further confusion and conflict"), *cert. denied*, 412 U.S. 939, 37 L. Ed. 2d 399 (1973); *O'Leary v. Coenen*, 251 N.W.2d 746, 749 (N.D. 1977) (holding that "the many exceptions and distinctions make the use of the common law categories complex, confusing, inequitable, and paradoxically, nonuniform"); *Hudson v. Gaitan*, 675 S.W.2d 699, 702 (Tenn. 1984) (holding that the numerous exceptions and subclassifications engrafted into the trichotomy have created a "complex patchwork of legal classifications which are by no means uniformly interpreted in the various jurisdictions").

Additionally, courts were often confronted with situations where none of the exceptions or subclassifications applied, yet if they utilized the basic trichotomy, unjust and unfair results would emerge. *See Smith*, 469 F.2d at 103 (stating that the trichotomy leads to harsh results); *Rowland v. Christian*, 69 Cal. 2d 108, 119, 443 P.2d 561, 568, 70 Cal. Rptr. 97, 104 (1968) (noting that "continued adherence to the common law distinctions can only lead to injustice"); *Jones*, 254 Kan. at 508, 867 P.2d at 309 (holding that the negligence standard is needed in premises-liability actions to avoid the harshness resulting from the rigid application of the trichotomy). Therefore, these courts were forced to define terms such as "invitee" and "active conduct" in a

broad or strained manner to avoid leaving an injured plaintiff deserving of compensation without redress. *See Rowland*, 69 Cal. 2d at 114, 443 P.2d at 565, 70 Cal. Rptr. at 101 (noting that courts have been forced to broadly define terms like active conduct to avoid the general rule limiting liability); *Peterson v. Balach*, 294 Minn. 161, 168-69, 199 N.W.2d 639, 644-45 (1972) (discussing the need to have numerous broadly defined exceptions to the trichotomy); *Basso v. Miller*, 40 N.Y.2d 233, 246, 352 N.E.2d 868, 875, 386 N.Y.S.2d 564, 571 (1976) (Breitel, J., concurring) (stating that courts have been forced to broaden the common-law categories to include persons who in the past would have been excluded). Although these broad or strained definitions may have led to just and fair results, they often involved rationales teetering on the edge of absurdity. For example, in *Hansen v. Richey*, 237 Cal. App. 2d 475, 480-81, 46 Cal. Rptr. 909, 913 (1965), under the trichotomy the court would not have been able to compensate the plaintiffs for their licensee son's drowning because the defendant did not maintain his pool in a manner which wantonly or recklessly exposed the decedent to danger. Therefore, to reach a just result, the court in *Hansen* read the phrase "active conduct" broadly to include the general "active" act of having a party. *Id.* Under this strained reading, however, "active conduct" could plausibly exist whenever a landowner "actively" invites someone to his home.

Another example of a broad or strained reading can be found in this Court's holding in *Walker v. Randolph County*, 251 N.C. 805, 112 S.E.2d 551 (1960). In *Walker*, we held that a seventy-seven-year-old woman who went to the county courthouse to look at a notice of sale of realty was an invitee when she fell down the courthouse stairway. This case involved a strained reading of the term "invitee" given that we have always defined that term to include only those individuals who enter another's premises for the mutual benefit of the landowner and himself. *See Crane*, 113 N.C. App. at 366, 438 S.E.2d at 452. That is, we were willing to implicitly conclude that the county somehow benefitted from posting notices it was statutorily required to post in order to classify the plaintiff as an invitee and hence provide compensation. *Walker*, 251 N.C. at 811, 112 S.E.2d at 555. Thus, *Hansen* and *Walker* demonstrate how courts have made strained readings of the trichotomy classifications to reach just and fair results.

The first significant move toward abolishing the common-law trichotomy occurred in 1957 when England—the jurisdiction giving rise to the trichotomy—passed the Occupier's Liability Act which abolished the distinction between invitees, licensees and so-called con-

NELSON v. FREELAND

[349 N.C. 615 (1998)]

tractual visitors. *See Rowland,* 69 Cal. 2d at 118, 443 P.2d at 568, 70 Cal. Rptr. at 104; *Peterson,* 294 Minn. at 165, 199 N.W.2d at 642; *Heins,* 250 Neb. at 754, 552 N.W.2d at 53. Shortly thereafter, the United States Supreme Court decided not to apply the trichotomy to admiralty law after concluding that it would be inappropriate to hold that a visitor is entitled to a different or lower standard of care simply because he is classified as a "licensee." *See Kermarec,* 358 U.S. at 630, 3 L. Ed. 2d at 554. In so ruling, the Court noted that "[t]he distinctions which the common law draws between licensee and invitee were inherited from a culture deeply rooted to the land, a culture which traced many of its standards to a heritage of feudalism." *Id.* The Court continued:

> In an effort to do justice in an industrialized urban society, with its complex economic and individual relationships, modern common-law courts have found it necessary to formulate increasingly subtle verbal refinements, to create subclassifications among traditional common-law categories, and to delineate fine gradations in the standards of care which the landowners owe to each. Yet even within a single jurisdiction, the classifications and subclassifications bred by the common law have produced confusion and conflict.

*Id.* at 631, 3 L. Ed. 2d at 554-55 (footnote omitted). Ultimately, the Court concluded that the numerous exceptions and subclassifications engrafted into the trichotomy have obscured the law, thereby causing it to move unevenly and with hesitation toward " 'imposing on owners and occupiers a single duty of reasonable care in all the circumstances.' " *Id.* at 631, 3 L. Ed. 2d at 555 (quoting *Kermarec v. Compagnie Generale Transatlantique,* 245 F.2d 175, 180 (Clark, C.J., dissenting)).

Nine years later, the Supreme Court of California decided the seminal case of *Rowland v. Christian,* 69 Cal. 2d 108, 443 P.2d 561, 70 Cal. Rptr. 97, which abolished the common-law trichotomy in California in favor of modern negligence principles. Specifically, the court in *Rowland* held that the proper question to be asked in premises-liability actions is whether "in the management of his property [the landowner] has acted as a reasonable man in view of the probability of injury to others." *Id.* at 119, 443 P.2d at 568, 70 Cal. Rptr. at 104. Moreover, the court followed both England's and the United States Supreme Court's lead by noting that "[w]hatever may have been the historical justifications for the common law distinctions, it is clear that those distinctions are not justified in the light of

our modern society." *Id.* at 117, 443 P.2d at 567, 70 Cal Rptr. at 103. The court continued by stating that the trichotomy was "contrary to our modern social mores and humanitarian values . . . [, and it] obscure[s] rather than illuminate[s] the proper considerations which should govern determination of the question of duty." *Id.* at 119, 443 P.2d at 568, 70 Cal. Rptr. at 104.

The *Rowland* decision ultimately served as a catalyst for similar judicial decisions across the country. Indeed, since *Rowland*, twenty-five jurisdictions have either modified or abolished their common-law trichotomy scheme—seven within the last five years.

Specifically, eleven jurisdictions have completely eliminated the common-law distinctions between licensee, invitee, and trespasser. *See Smith*, 469 F.2d 97; *Webb v. City of Sitka*, 561 P.2d 731 (Alaska 1977); *Mile High Fence Co. v. Radovich*, 175 Colo. 537, 489 P.2d 308 (1971);[2] *Pickard v. City of Honolulu*, 51 Haw. 134, 452 P.2d 445 (1969); *Keller v. Mols*, 129 Ill. App. 3d 208, 472 N.E.2d 161 (1984) (abolishing with respect to children only); *Sheets v. Ritt, Ritt & Ritt, Inc.*, 581 N.W.2d 602 (Iowa 1998); *Cates v. Beauregard Elec. Co-op., Inc.*, 328 So. 2d 367 (La.), *cert. denied*, 429 U.S. 833, 50 L. Ed. 2d 98 (1976); *Limberhand v. Big Ditch Co.*, 218 Mont. 132, 706 P.2d 491 (1985); *Moody v. Manny's Auto Repair*, 110 Nev. 320, 871 P.2d 935 (1994); *Ouellette v. Blanchard*, 116 N.H. 552, 364 A.2d 631 (1976); *Basso*, 40 N.Y.2d 233, 352 N.E.2d 868, 386 N.Y.S.2d 564.

Further, fourteen jurisdictions have repudiated the licensee-invitee distinction while maintaining the limited-duty rule for trespassers. *See Wood v. Camp*, 284 So. 2d 691 (Fla. 1973); *Jones*, 254 Kan. 499, 867 P.2d 303; *Poulin v. Colby College*, 402 A.2d 846 (Me. 1979); *Baltimore Gas & Elec. Co. v. Flippo*, 348 Md. 680, 705 A.2d 1144 (1998); *Mounsey v. Ellard*, 363 Mass. 693, 297 N.E.2d 43 (1973); *Peterson*, 294 Minn. 161, 199 N.W.2d 639; *Heins*, 250 Neb. 750, 552 N.W.2d 51; *Ford v. Board of County Comm'rs*, 118 N.M. 134, 879 P.2d 766 (1994); *O'Leary*, 251 N.W.2d 746; *Ragnone v. Portland Sch. Dist. No. 1J*, 291 Or. 617, 633 P.2d 1287 (1981); *Tantimonico v. Allendale Mut. Ins. Co.*, 637 A.2d 1056 (R.I. 1994); *Hudson*, 675 S.W.2d 699; *Antoniewicz v. Reszcynski*, 70 Wis. 2d 836, 236 N.W.2d 1 (1975); *Clarke v. Beckwith*, 858 P.2d 293 (Wyo. 1993).

In summation, nearly half of all jurisdictions in this country have judicially abandoned or modified the common-law trichotomy in

---

2. In 1990, the Colorado legislature reinstated the distinctions. *See* Colo. Rev. Stat. § 13-21-115(3) (1996).

favor of the modern "reasonable-person" approach that is the norm in all areas of tort law.

## C. THE ADVANTAGES AND DISADVANTAGES OF ABOLISHING THE COMMON-LAW TRICHOTOMY

### 1. HISTORY AND PURPOSE BEHIND THE TRICHOTOMY

To assess the advantages and disadvantages of abolishing the common-law trichotomy, we first consider the purposes and policies behind its creation and current use. The common-law trichotomy traces its roots to nineteenth-century England. John Ketchum, *Missouri Declines an Invitation to Join the Twentieth Century: Preservation of the Licensee-Invitee Distinction in Carter v. Kinney*, 64 UMKC L. Rev. 393, 394 (1995). Indeed, it emanated from an English culture deeply rooted to the land; tied with feudal heritage; and wrought with lords whose land ownership represented power, wealth, and dominance. *Id.*; *see also Kermarec*, 358 U.S. at 630, 3 L. Ed. 2d at 554. Even though nineteenth-century courts were aware of the threat that unlimited landowner freedom and its accompanying immunity placed upon the community, they nevertheless refused to provide juries with unbounded authority to determine premises-liability cases. Rather, these courts restricted the jury's power because juries were comprised mainly of potential land *entrants* who most likely would act to protect the community at large and thereby reign in the landowner's sovereign power over his land. Sears, *Common Law of Premises Liability*, 44 U. Kan. L. Rev. at 176. Thus, the trichotomy was created to disgorge the jury of some of its power by either allowing the judge to take the case from the jury based on legal rulings or by forcing the jury to apply the mechanical rules of the trichotomy instead of considering the pertinent issue of whether the landowner acted reasonably in maintaining his land.

Additionally, the trichotomy was created at a time when principles of negligence were not in existence. Indeed, when English common law was articulating the trichotomy, the principle that a man should be held responsible for foreseeable damages was only hesitatingly recognized in a limited number of cases. Norman S. Marsh, *The History and Comparative Law of Invitees, Licensees and Trespassers*, 69 Law. Q. Rev. 182, 184 (1953). Therefore, the trichotomy was perfected at a time when our modern tenet and pillar of tort law—the legal concept of negligence—was largely unrecog-

nized.[3] It was not until the beginning of this country's industrial revolution that the community and the judiciary undertook a greater acceptance of fault-based liability which led to the creation of our modern era of tort law and the law of negligence. Ketchum, *Missouri Declines*, 64 UMKC L. Rev. at 397.

Almost immediately, the emergence of negligence law conflicted with the immunity conferred upon landowners under the trichotomy. Kathryn E. Eriksen, *Premises Liability in Texas—Time For a "Reasonable" Change*, 17 St. Mary's L.J. 417, 421 (1986). Common-law courts, however, decided not to replace the trichotomy with modern principles of negligence law, as they did in almost all other tort areas, but rather "superimposed the new [negligence] principles upon the existing framework of entrant categories." Sears, *Common Law of Premises Liability*, 44 U. Kan. L. Rev. at 176. This combination resulted in our current scheme of premises-liability law which allows judges to maintain control over jury discretion while, at the same time, utilizing "duty of care" principles set forth in negligence theory. *Id.*

2. REASONS FOR AND AGAINST ABOLISHING THE TRICHOTOMY

Although the modern trend of premises-liability law in this country has been toward abolishing the trichotomy in favor of a reasonable-person standard, there are some jurisdictions that have refused to modify or abolish it.[4] One of the primary reasons that some jurisdictions have retained the trichotomy is fear of jury abuse—a fear similar to the reason it was created in the first place. Specifically, jurisdictions retaining the trichotomy fear that plaintiff-oriented juries—like feudal juries composed mostly of land entrants—will impose unreasonable burdens upon defendant-landowners. *See Ouellette*, 116 N.H. at 560, 364 A.2d at 636 (Grimes, J., dissenting). This argument, however, fails to take into account that juries have

3. Indeed, negligence principles were first enunciated in the 1883 case of *Heaven v. Pender*, 11 Q.B.D. 503 (1883), a case decided more than forty years after the common-law trichotomy emerged. Ketchum, *Missouri Declines*, 64 UMKC L. Rev. at 397.

4. *See McMullan v. Butler*, 346 So. 2d 950 (Ala. 1977); *Nicoletti v. Westcor, Inc.*, 131 Ariz. 140, 639 P.2d 330 (1982); *Baldwin v. Mosley*, 295 Ark. 285, 748 S.W.2d 146 (1988); *Morin v. Bell Court Condominium Ass'n*, 223 Conn. 323, 612 A.2d 1197 (1992); *Bailey v. Pennington*, 406 A.2d 44 (Del. 1979), *appeal dismissed*, 444 U.S. 1061, 62 L. Ed. 2d 744 (1980); *Mooney v. Robinson*, 93 Idaho 676, 471 P.2d 63 (1970); *Kirschner v. Louisville Gas & Elec. Co.*, 743 S.W.2d 840 (Ky. 1988); *Caroff v. Liberty Lumber Co.*, 146 N.J. Super. 353, 369 A.2d 983, *certif. denied*, 74 N.J. 266, 377 A.2d 671 (1977); *Lohrenz v. Lane*, 787 P.2d 1274 (Okla. 1990).

properly applied negligence principles in all other areas of tort law, and there has been no indication that defendants in other areas have had unreasonable burdens placed upon them. Moreover, given that modern jurors are more likely than feudal jurors to be landowners themselves, it is unlikely that they would be willing to place a burden upon a defendant that they would be unwilling to accept upon themselves. *See Smith*, 469 F.2d at 106-07.

Another fear held by jurisdictions retaining the trichotomy is that by substituting the negligence standard of care for the common-law categories, landowners will be forced to bear the burden of taking precautions such as the expensive cost associated with maintaining adequate insurance policies. *See Mariorenzi v. Joseph DiPonte, Inc.*, 114 R.I. 294, 308, 333 A.2d 127, 134 (1975) (Joslin, J., dissenting). This argument, however, ignores the fact that every court which has abolished the trichotomy has explicitly stated that its holding was not intended to make the landowner an absolute insurer against all injuries suffered on his property. *See, e.g., Jones*, 254 Kan. at 510, 867 P.2d at 311 ("a proprietor or operator of a trade or business is not an absolute insurer of the safety of the customers"); *Poulin*, 402 A.2d at 851 ("[t]his does not require an owner or occupier to insure the safety of his lawful visitors"); *Heins*, 250 Neb. at 761, 552 N.W.2d at 57 ("[o]ur holding does not mean that owners and occupiers of land are now insurers of their premises"); *O'Leary*, 251 N.W.2d at 752 ("[w]e do not now hold that land occupiers are now insurers of their premises"). Rather, they require landowners only to exercise reasonable care in the maintenance of their premises. *See Heins*, 250 Neb. at 760, 552 N.W.2d at 56.

Lastly, opponents of abolishing the trichotomy argue that retention of the scheme is necessary to ensure predictability in the law. For example, prior to abolishing its common-law trichotomy, the Kansas Supreme Court declined an invitation to do so because it believed that the replacement of its stable and established system would result in one that is devoid of standards for liability. *See Britt v. Allen County Community Jr. College*, 230 Kan. 502, 638 P.2d 914 (1982). Kansas, however, eventually recognized that the trichotomy and its accompanying exceptions and subclassifications were more complex and confusing than the negligence standard of reasonableness.

The jurisdictions eliminating the trichotomy address the aforementioned concerns and provide well-articulated reasons for their decision to abandon the trichotomy. First, these jurisdictions note

that the trichotomy was created during feudal times when land formed the principal basis of wealth and when it was desirable to provide a landowner free reign to use and exploit his land, without need for vigilant protection of those who entered his property. *See Basso*, 40 N.Y.2d at 245, 352 N.E.2d at 875, 386 N.Y.S.2d at 571 (Breitel, J., concurring). In following this reasoning, the Supreme Court of New Hampshire noted that " 'the consensus of modern opinion is that the special privilege these rules accord to the occupation of land sprang from the high place which land has traditionally held in English and American thought.' " *Ouellette*, 116 N.H. at 554, 364 A.2d at 632 (quoting 2 Fowler V. Harper & Fleming James, Jr., *The Law of Torts* 1432 (1956)). Similarly, the District of Columbia Circuit Court noted that "[t]he prestige and dominance of the landowning class in the nineteenth century contributed to the common law's emphasis on the economic and social importance of free use and exploitation of land over and above [an entrant's] personal safety." *Smith*, 469 F.2d at 101.

After noting the trichotomy's origins, abolishing courts expressed apprehension about applying it in modern times. For example, the Supreme Court of Massachusetts stated:

Perhaps, in a rural society with sparse land settlements and large estates, it would have been unduly burdensome to obligate the owner to inspect and maintain distant holdings for a class of entrants who were using the property "for their own convenience" but the special immunity which the licensee rule affords landowners cannot be justified in an urban industrial society.

*Mounsey*, 363 Mass. at 706, 297 N.E.2d at 51 (citation omitted). Likewise, when the Supreme Court of Florida abolished the common-law trichotomy, it noted that it was

aware of the contiguous property of others which demands concern for the welfare of our neighbor. Life in these United States is no longer as simple as in the frontier days of broad expanses and sparsely settled lands. Inexorably our peoples, gregarious in nature, have magnetized to limited and congested areas. With social change must come change in the law, for as President Woodrow Wilson observed, "The first duty of the law is to keep sound the society it serves."

*Wood*, 284 So. 2d at 696. Moreover, in *Smith v. Arbaugh's Restaurant, Inc.*, the District of Columbia Circuit Court noted that it did "not

believe the rules of liability imposed by courts in the eighteenth century are today the proper tools with which to allocate the costs and risk of loss for human injury." 469 F.2d at 99. Thus, these courts determined that the social and policy considerations underlying the creation of the common-law trichotomy were no longer viable, and therefore they concluded that it was proper to lay it to rest.

On a more practical level, the trichotomy has been criticized for creating a complex, confusing, and unpredictable state of law. The United States Supreme Court, for example, stated that the trichotomy "bred by the common law [has] produced confusion and conflict." *Kermarec*, 358 U.S. at 631, 3 L. Ed. 2d at 555. Similarly, the California Supreme Court noted that "[t]he common law rules obscure rather than illuminate the proper considerations which should govern determination of the question of duty . . . [, and] continued adherence to the common law distinctions can only lead to injustice or, if we are to avoid injustice, further fictions with the resulting complexity and confusion." *Rowland*, 69 Cal. 2d at 118, 443 P.2d at 567, 70 Cal. Rptr. at 104; *see also Peterson*, 294 Minn. at 166, 199 N.W.2d at 643 (stating that "judges have been highly critical of the common-law straitjacket of highly technical and arbitrary classifications which have often led to confusion in the law and inequity in the cases decided").

The complexity and confusion associated with the trichotomy is twofold. First, the trichotomy itself often leads to irrational results not only because the entrant's status can change on a whim, but also because the nuances which alter an entrant's status are undefinable. Consider, for example, the following scenario: A real-estate agent trespasses onto another's land to determine the value of property adjoining that which he is trying to sell; the real-estate agent is discovered by the landowner, and the two men engage in a business conversation with respect to the landowner's willingness to sell his property; after completing the business conversation, the two men realize that they went to the same college and have a nostalgic conversation about school while the landowner walks with the man for one acre until they get to the edge of the property; lastly, the two men stand on the property's edge and speak for another ten minutes about school. If the real-estate agent was injured while they were walking off the property, what is his classification? Surely, he is no longer a trespasser, but did his status change from invitee to licensee once the business conversation ended? What if he was hurt while the two men were talking at the property's edge? Does it matter how long they were talking?

NELSON v. FREELAND

[349 N.C. 615 (1998)]

The Supreme Court of Wisconsin made a similar argument in *Antoniewicz* when it asked whether there is any reason why one who invites a guest to a party should have less concern for that individual's well-being than he has for the safety of an insurance salesman delivering a policy to his home. *See Antoniewicz*, 70 Wis. 2d at 854, 236 N.W.2d at 10. The court then inquired whether the life or welfare of the guest should be regarded in a more sacred manner. *Id.* Moreover, it queried whether we realistically can say that reasonable people vary their conduct based upon the status of the entrant. *Id.*

The preceding illustrations demonstrate the complexity associated with the trichotomy. Moreover, they demonstrate that the trichotomy often forces the trier of fact to focus upon irrelevant factual gradations instead of the pertinent question of whether the landowner acted reasonably toward the injured entrant. For instance, in the real-estate agent hypothetical posed above, the trier of fact would be focused on determining the agent's purpose for being on the land at the time of injury instead of addressing the pertinent question of whether the landowner acted as a reasonable person would under the circumstances.

Corresponding to this argument is the fact that "[i]n many instances, recovery by an entrant has become largely a matter of chance, dependent upon the pigeonhole in which the law has put him, e.g., 'trespasser,' 'licensee,' or 'invitee'—each of which has radically different consequences in law." *Peterson*, 294 Minn. at 166, 199 N.W.2d at 643. Significantly, this pigeonholing is essentially an attempt to transmute propositions of fact into propositions of law— a transmutation that has only distracted the jury's vision away from the proper consideration of whether the defendant acted reasonably. For instance, the three experienced Court of Appeals judges who initially decided this case—Judge Smith, Chief Judge Arnold, and Judge Walker—disagreed not only with respect to whether plaintiff was an invitee or a licensee, but also as to whether this case involved a question of law or fact.

Lastly, we note that the trichotomy has been criticized because its underlying landowner-immunity principles force many courts to reach unfair and unjust results disjunctive to the modern fault-based tenets of tort law. For example, the Kansas Supreme Court noted that "modern times demand a recognition that requiring all to exercise reasonable care for the safety of others is the more humane approach." *Jones*, 254 Kan. at 504, 867 P.2d at 307. Likewise, the California Supreme Court noted that using the trichotomy to deter-

mine whether a landowner owed the injured plaintiff a duty of care "is contrary to our modern social mores and humanitarian values." *Rowland*, 69 Cal. 2d at 118, 443 P.2d at 567, 70 Cal. Rptr. at 104. Indeed, modern thought dictates that "[a] man's life or limb does not become less worthy of protection by the law nor a loss less worthy of compensation . . . because he has come upon the land of another without permission or with permission but without a business purpose." *Id.* Simply put,

> "the traditional rule confers on an occupier of land a special privilege to be careless which is quite out of keeping with the development of accident law generally and is no more justifiable here than it would be in the case of any other useful enterprise or activity."

*Antoniewicz*, 70 Wis. 2d at 851, 236 N.W.2d at 8-9 (quoting 2 Fowler V. Harper & Fleming James, Jr., *The Law of Torts* § 27.3, at 1440 (1956)).

The aforementioned complexity, confusion, and harshness associated with the trichotomy's application is evidenced in North Carolina's dealings with the question of whether a licensee turns into an invitee when he provides the landowner with some benefit. For example, in *Crane v. Caldwell*, 113 N.C. App. 362, 438 S.E.2d 449, our Court of Appeals determined that the injured plaintiff was an invitee when, at his neighbor's request, he helped his neighbor move a boat from his backyard dock. In making this ruling, the Court stated that the act of helping a neighbor move a boat from his yard was not one "which one neighbor customarily performs for another in the ordinary course of friendly relations." *Id.* at 366, 438 S.E.2d at 452. Yet, at the same time, the Court stated that "[p]laintiff received no benefit from any of the services he performed for defendant." *Id.* Reading these statements together creates an inconsistency—that is, if the plaintiff received nothing for his acts, yet did not do them as a friendly neighbor, then how should we classify his conduct?

The issue of benefit becomes more perplexing when the preceding case is read in light of some other North Carolina decisions. For example, in *Beaver v. Lefler*, 8 N.C. App. 574, 174 S.E.2d 806 (1970), our Court of Appeals classified the plaintiff as a licensee when he was injured helping his neighbor carry meat into his home. Apparently, reading *Beaver* in conjunction with *Crane* leads one to believe that neighbors regularly carry meat into each others' homes, but do not help each other move things. This decision is even more baffling

when read in light of *Briles v. Briles*, 43 N.C. App. 575, 259 S.E.2d 393 (1979), *disc. rev. denied*, 299 N.C. 329, 265 S.E.2d 394 (1980), where our Court of Appeals held that the plaintiff-parents were invitees when, at their son's request, they went to his house to check on his freezer. Logically, this case cannot be reconciled with *Crane* and *Beaver*. Indeed, looking at all three cases as a whole, North Carolina premises-liability jurisprudence appears to stand for the proposition that a friend who carries meat into his neighbor's house is a licensee because he performs a neighborly or friendly act, while a parent who checks her son's freezer is an invitee because she performs some duty which thereby mandates that the parent receive a higher degree of care.

Further, our cases show that the trichotomy is no longer viable because of the complexity and confusion surrounding the numerous exceptions and subclassifications engrafted into it. Indeed, our Court of Appeals noted that "the relevant cases tend to illustrate exceptions to the general rule rather than the rule itself." *Hockaday v. Morse*, 57 N.C. App. 109, 111, 290 S.E.2d 763, 765, *disc. rev. denied*, 306 N.C. 384, 294 S.E.2d 209 (1982). Consider, for example, just a sample of the trichotomy's exceptions and subclassifications: distinctions between active and passive negligence, *DeHaven*, 95 N.C. App. at 400, 382 S.E.2d at 858; situations where a landlord has control over a common way, *Jones v. Kinston Hous. Auth.*, 262 N.C. at 605-06, 138 S.E.2d at 236; actions involving police officers, *Newton*, 342 N.C. at 562, 467 S.E.2d at 64; failure to warn of a known defect, *Thompson v. DeVonde*, 235 N.C. 520, 522, 70 S.E.2d 424, 425-26 (1952); work by an independent contractor, *Broadway v. Blythe Indus.*, 313 N.C. 150, 155-56, 326 S.E.2d 266, 271 (1985); obvious versus nonobvious dangerous conditions, *Branks*, 320 N.C. at 624, 359 S.E.2d at 783; invitee exceeding the scope of his invitation, *Cupita*, 252 N.C. at 350, 113 S.E.2d at 715; minor and incidental benefits, *McCurry*, 90 N.C. App. at 644, 369 S.E.2d at 391; conditions diverting the injured party's attention, *Walker*, 251 N.C. at 808, 112 S.E.2d at 553; known or knowable criminal activity, *Murrow v. Daniels*, 321 N.C. 494, 500-01, 364 S.E.2d 392, 398-99 (1988); and the attractive-nuisance doctrine, *Fitch*, 234 N.C. at 635, 68 S.E.2d at 257. These exceptions and subclassifications have created a labyrinth of jurisprudence through which the trier of fact must make its way with difficulty to determine liability. Instead of clarifying premises-liability law, these exceptions and subclassifications have created such subtle nuances that a typical landowner can never be sure what constitutes actionable conduct.

Significantly, the fact that judges and justices cannot agree as to whether a landowner's conduct is actionable—as evidenced by dissents in prior cases—evidences that the trichotomy fails to clearly articulate a landowner's standard of care. *See, e.g., Roumillat,* 331 N.C. at 69, 414 S.E.2d at 345 (Frye, Exum, & Lake, JJ., dissenting); *Pulley,* 326 N.C. at 709, 392 S.E.2d at 385 (Meyer & Martin, JJ., dissenting); *Goldman v. Kossove,* 253 N.C. 370, 374, 117 S.E.2d 35, 38 (1960) (Moore & Rodman, JJ., dissenting); *Gray v. Small,* 104 N.C. App. 222, 224, 408 S.E.2d 538, 539 (1991) (Phillips, J., dissenting), *aff'd per curiam,* 331 N.C. 279, 415 S.E.2d 362 (1992); *McIntosh v. Carefree Carolina Communities, Inc.,* 98 N.C. App. 653, 657, 391 S.E.2d 851, 853 (1990) (Greene, J., dissenting), *rev'd per curiam,* 328 N.C. 87, 399 S.E.2d 114 (1991) (based upon dissent); *Starr,* 40 N.C. App. at 148, 252 S.E.2d at 223 (Hedrick, J., dissenting); *Smith v. VonCannon,* 17 N.C. App. 438, 440, 194 S.E.2d 362, 363 (Brock, J., dissenting), *aff'd,* 283 N.C. 656, 197 S.E.2d 524 (1973). This confusion is most disturbing when considered in light of the comparatively simplistic approach set forth in the modern tort principle of negligence and its accompanying standard of reasonable care under the circumstances.

In sum, there are numerous advantages associated with abolishing the trichotomy. First, it is based upon principles which no longer apply to today's modern industrial society. Further, the preceding cases demonstrate that the trichotomy has failed to elucidate the duty a landowner owes to entrants upon his property. Rather, it has caused confusion amongst our citizens and the judiciary—a confusion exaggerated by the numerous exceptions and subclassifications engrafted into it. Lastly, the trichotomy is unjust and unfair because it usurps the jury's function either by allowing the judge to dismiss or decide the case or by forcing the jury to apply mechanical rules instead of focusing upon the pertinent issue of whether the landowner acted reasonably under the circumstances. Thus, we conclude that North Carolina should join the twenty-four other jurisdictions which have modified or abolished the trichotomy in favor of modern negligence principles.

## II. THE NEW APPROACH TO PREMISES LIABILITY IN NORTH CAROLINA

Given the numerous advantages associated with abolishing the trichotomy, this Court concludes that we should eliminate the distinction between licensees and invitees by requiring a standard of reasonable care toward all lawful visitors. Adoption of a true negli-

gence standard eliminates the complex, confusing, and unpredictable state of premises-liability law and replaces it with a rule which focuses the jury's attention upon the pertinent issue of whether the landowner acted as a reasonable person would under the circumstances.

In so holding, we note that we do not hold that owners and occupiers of land are now insurers of their premises. Moreover, we do not intend for owners and occupiers of land to undergo unwarranted burdens in maintaining their premises. Rather, we impose upon them only the duty to exercise reasonable care in the maintenance of their premises for the protection of lawful visitors.

Further, we emphasize that we will retain a separate classification for trespassers. We believe that the status of trespasser still maintains viability in modern society, and more importantly, we believe that abandoning the status of trespasser may place an unfair burden on a landowner who has no reason to expect a trespasser's presence. Indeed, whereas both invitees and licensees enter another's land under color of right, a trespasser has no basis for claiming protection beyond refraining from willful injury. *See Ford*, 118 N.M. at 138, 879 P.2d at 770.

Lastly, we note that we are well aware of the principle of *stare decisis* and the important role it plays in maintaining a stable, established, and predictable set of laws. Indeed, we undertake this exhaustive analysis to illustrate our reluctance to abolish parts of our common law. "This Court has never overruled its decisions lightly. No court has been more faithful to *stare decisis*." *Rabon v. Rowan Mem'l Hosp., Inc.*, 269 N.C. 1, 20, 152 S.E.2d 485, 498 (1967). Nonetheless, we also are aware that "[i]t is the tradition of common-law courts to reflect the spirit of their times and discard legal rules when they serve to impede society rather than to advance it." *Antoniewicz*, 70 Wis. 2d at 855, 236 N.W.2d at 10. The doctrine is not inflexible, and therefore we will not hesitate to abandon a rule which has resulted in injustices, whether it be criminal or civil. *See Rabon*, 269 N.C. at 20, 152 S.E.2d at 498. "There is no virtue in sinning against light or in persisting in palpable error, for nothing is settled until it is settled right." *Sidney Spitzer & Co. v. Commissioners of Franklin County*, 188 N.C. 30, 32, 123 S.E. 636, 638 (1924). As appropriately stated by Judge Cardozo,

I think that when a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of jus-

tice or with the social welfare, there should be less hesitation in frank avowal and full abandonment. There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origins it was the product of institutions or conditions which have gained a new significance or development with the progress of the years.

Benjamin Cardozo, *The Nature of the Judicial Process* 120 (1921).

Given that we are convinced that the common-law trichotomy is no longer viable, we should put it to rest. By so doing, we align North Carolina premises-liability law with all other aspects of tort law by basing liability upon the pillar of modern tort theory: negligence. Moreover, we now join twenty-four other jurisdictions which have carefully examined and analyzed this issue, ultimately determining that the trichotomy is no longer applicable in the modern world.

Having adopted a new rule in premises-liability cases, we are obliged to balance countervailing factors to determine whether it should be applied retroactively. *See Cox v. Haworth*, 304 N.C. 571, 573, 284 S.E.2d 322, 324 (1981). These factors include the "reliance on the prior decision, the degree to which the purpose behind the new decision can be achieved solely through prospective application, and the effect of retroactive application on the administration of justice." *Id.* In considering these factors, we begin with a presumption of retroactivity, a presumption which can only be rebutted by compelling reasons. *Id.* After balancing the aforementioned factors, we do not find compelling reasons to apply this rule prospectively only and therefore give it both prospective and retrospective application.

Accordingly, plaintiff Nelson is entitled to a trial at which the jury shall be instructed under the new rule adopted by this opinion. Specifically, the jury must determine whether defendant Freeland fulfilled his duty of reasonable care under the circumstances. This case is therefore remanded to the Court of Appeals for further remand to the Superior Court, Guilford County, for proceedings consistent with this opinion.

REVERSED AND REMANDED.

Chief Justice MITCHELL concurring in the result

In the present case the trial court entered summary judgment in favor of defendants. The majority in the Court of Appeals affirmed the trial court. I am convinced that a jury could find that plaintiff entered defendants' premises as an invitee and defendants violated the duty of care owed an invitee. That being the case, the Court of Appeals erred in affirming the trial court's order of summary judgment for defendants. Accordingly, I find it unnecessary for this Court to consider whether our prior holdings in this area of the common law have been erroneous and must be modified. Further, I think it inadvisable to render an opinion of the magnitude of that entered by the majority in this case when, as here, no party has suggested such a modification of the common law and this Court has not had the benefit of briefs and arguments on the issues decided by the majority.

For the foregoing reasons, I concur only in the result reached by the majority.

Justice Lake and ORR join in this concurring opinion.