McGEE, Chief Judge.
Plaintiff appeals the grant of summary judgment in favor of Defendants Shawn Fisher and Tracy Fisher. We affirm the ruling of the trial court.
Michael Scott Rogers ("Michael"),[1] sixteen years old, died of hypothermia in the early morning hours of 21 February 2010, after having been beaten and left outside in sub-freezing temperatures. Michael's mother and administrator of his estate, Barbara Leonard ("Plaintiff"), filed a complaint against multiple defendants on 17 February 2012, amended on 8 June 2012, that included multiple causes of action related to Michael's death. Shawn Fisher ("Shawn") and his wife, Tracy Fisher ("Tracy") (together, "Defendants"), are the only defendants relevant to the present appeal.
The following facts are not in material dispute unless otherwise indicated. Defendants were long-haul truck drivers who were on out-of-state business on the night of 20 February 2010. Defendants' nineteen-year-old son, Scott Allen Fisher ("Scott") decided to have a party ("the party") at Defendants' house ("the house")[2] without Defendants' knowledge. Scott invited a number of people to the party, including a friend who provided alcohol for the partygoers because there was no alcohol in the house. One of the people Scott invited was Michael Coleman "Coley" Hall ("Coley"). Coley received permission from Scott to bring additional guests. Michael was one of the guests who arrived with Coley. Many of the guests were not of legal drinking age, and Scott admitted that he had become intoxicated at the party. Michael's autopsy showed that he had alcohol in his system at the time of death, and multiple people gave statements or testified[3] that Michael was acting drunk and behaving in a manner that made some of the other guests uncomfortable.
Evidence suggests that Michael got into an altercation with another party guest, Richard Thomas ("Richard"), resulting in Michael being left on the floor, bloodied. It is undisputed that Michael and Scott also got into an altercation at the house, that Scott threw the first punch, and that Scott then punched Michael several more times while Michael was on the floor.
At approximately 11:30 p.m. on 20 February 2010, Keith Fisher ("Keith"), Shawn's uncle, who lived close by the house, called Shawn to inform him there appeared to be a party going on at the house. Shawn asked Keith to go over to the house and tell everybody to leave. While Keith was still on the phone with Shawn, he walked over to the house and started asking people to leave. The party guests complied. Keith went into the house, where he saw a male-now known to have been Michael-lying on the floor. A female was wiping blood off Michael's lip. According to Keith's statement to the police, after Keith told everyone in the house they had to leave, Scott "helped [Michael] up" then "they" laid Michael down in a different location. Keith believed "[t]hey were going to leave [Michael] there." Keith reported that he heard conflicting accounts concerning whether Michael had been hurt during a fight, or had been hurt because he had fallen down. Keith reported that Michael "was floppin[g] around drunk." There is evidence suggesting that, while still at the house, Michael may have called his mother and informed her that he did not know where he was, and that he wanted someone to come pick him up and take him home.
Keith stated that the people remaining at the house, including Coley-the person with whom Michael had arrived, were getting into a Volkswagen Passat ("the Passat"). Keith told them they could not leave Michael at the house. Keith reported that Michael, who by this time was lying on the ground outside, "jumps up [and] starts beating his chest and cussing," but then walked to the Passat and got into the back, next to two females. Scott was in the front passenger seat. A male Keith did not know was in the driver's seat, but the male driver was later determined to be Coley. The Passat then drove off, with Scott and Coley in the front, and Michael and the two females in the back. Both females had also arrived at the party in the same car as Michael and Coley. The Passat belonged to Ashley Palmer ("Ashley"); however, Ashley had left the house earlier in another guest's Volkswagen Jetta.
Though there was no definitive evidence presented to the trial court that Defendants knew that Scott had beaten Michael at the house, or that Defendants knew, or should have known, that Michael was in any additional danger, Plaintiff argues the evidence was sufficient to survive summary judgment on the question of whether Defendants had actual knowledge that a guest at the house-Michael-had been beaten by Scott, and that Defendants should have known Scott posed a continuing danger to Michael.
Though Shawn asked Keith to take care of things at the house and get everyone to leave, Plaintiff argues that Defendants had a duty to call emergency services immediately upon learning that Scott had injured a guest in a fight at the house. Defendants did not call emergency services, but Shawn testified that he made a follow-up call to Keith to make sure "that everything was settled down[.]"
Scott testified that, after leaving the house, Coley drove the Passat and they intended to take Michael home. However, Michael "began to freak out again and start beating me in the back of the head." Scott testified that was when he decided Michael should get out of the Passat. It is undisputed that Michael was driven to a secluded parking lot near the intersection of King Road and U.S. 64, and that Michael exited the Passat. What is disputed is whether Michael left the Passat willingly, or whether he was forced out. Also disputed is whether Michael was beaten after exiting the Passat, or whether his injuries were all sustained as a result of the earlier altercations at the house.
It is not disputed that Michael was left in a secluded parking lot, late at night in sub-freezing temperatures, with his torso completely unclothed. Scott testified that he drove the Passat out of the parking lot where Michael had been left. After being left in the parking lot, Michael called Plaintiff, but was unable to identify his location. As a result of calls Michael made to Plaintiff, Plaintiff alerted the police that Michael might be in danger and police tried to locate him. The police initiated a search for Michael, which became more urgent after it became clear Michael had been abandoned and sounded as if he was in physical distress.
Though the timeline of events is not entirely clear from the record, evidence suggests Keith called Shawn to report the party at approximately 11:30 p.m. on 20 February 2010. The first law enforcement officer arrived at the house at approximately 12:37 a.m. on 21 February 2010 and, at that time, there was no one at the house. Shortly after law enforcement arrived at the house, Shawn, who was on the phone with Keith, asked to speak with an officer.[4]
All evidence suggests that, when Defendants first spoke with police and were alerted to the fact that Michael was missing and potentially in danger, they fully cooperated with the police. Defendants gave permission for police to enter the house. Defendants contacted Scott multiple times and relayed to police information Scott gave them about where Michael had been let out of the Passat (though Scott was not truthful in some of his statements to Defendants). Defendants contacted the police multiple times during the night and early morning. Defendants passed along additional information they had. That information helped police locate the Passat at Ashley's apartment, where they also located Scott. Plaintiff contends that Defendants purposefully withheld Scott's cell phone number from the police, but there is no competent evidence in the record supporting that contention.
While police and other agencies searched for Michael through the night and into the morning, Michael apparently wandered approximately one hundred yards into a field where he was found just before 11:00 a.m. on 21 February 2010. Michael had died of exposure.
Scott was eventually arrested and indicted for involuntary manslaughter, and was convicted of involuntary manslaughter on 18 May 2012. Scott appealed his conviction to this Court, but this Court found no error by opinion filed 6 August 2013. State v. Fisher,--- N.C.App. ----, 745 S.E.2d 894 (2013). Additional facts may be found in our 6 August 2013 opinion.
Plaintiff filed her amended complaint on 8 June 2012, in which she stated claims against Defendants for common law negligence and negligence based upon premises liability. Defendants filed a motion for summary judgment on 31 January 2014. Defendants' motion was heard 17 February 2014, and an order granting Defendants' motion for summary judgment was entered 12 March 2014. Plaintiff appealed. Subsequent to Plaintiff's filing notice of appeal, Plaintiff filed a Rule 60(b) motion asking the trial court to "enter an Order indicating that it favors allowing ... [P]laintiff Rule 60(b) relief from the order granting summary judgment due to newly discovered evidence[.]" The "newly discovered evidence" was records from the North Carolina Department of Public Safety ("DPS") indicating that Scott resided at the house at the time of the party, the assaults on Michael, and Michael's death. Plaintiff argued that this evidence at least raised questions of material fact sufficient to defeat Defendants' motion for summary judgment. Plaintiff then filed a motion with this Court on 26 November 2014, seeking "to stay [Plaintiff's] appeal pending the trial court's determination of Plaintiff's Rule 60(b) motion." This Court granted Plaintiff's motion to stay the appeal pending the trial court's report on Plaintiff's Rule 60(b) motion.
The trial court filed its "Report of its Inclination to Rule on Plaintiff's Rule 60 Motion" on 3 February 2015. In its 3 February 2015 report, the trial court stated: "this [c]ourt reports to the North Carolina Court of Appeals that it would be inclined to DENY Plaintiff's Motion brought pursuant to G.S. § 1A-1, Rule 60(b)(2) and (3)." We now consider simultaneously Plaintiff's arguments from her original appeal and those pertaining to the denial of her Rule 60(b) motion. See Hall v. Cohen,177 N.C.App. 456, 458, 628 S.E.2d 469, 471 (2006).
I.
Plaintiff argues that the trial court erred in granting summary judgment in favor of Defendants because: "Plaintiff forecasts evidence of actual notice to Defendants of the danger to Michael, and the Defendants' actual exercise of control over the source of the danger, their son Scott Fisher." We disagree.
Summary judgment is properly entered when the pleadings, depositions, answers to interrogatories, admissions and affidavits show no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. The burden is on the movant to show:
(1) an essential element of plaintiff's claim is nonexistent; (2) plaintiff cannot produce evidence to support an essential element of its claim; or (3) plaintiff cannot surmount an affirmative defense raised in bar of its claim.
A prima faciecase of negligence includes the following elements:
(1) that defendant failed to exercise proper care in the performance of a duty owed plaintiff; (2) the negligent breach of that duty was a proximate cause of plaintiff's injury; and (3) a person of ordinary prudence should have foreseen that plaintiff's injury was probable under the circumstances.
Liller v. Quick Stop Food Mart, Inc.,131 N.C.App. 619, 621, 507 S.E.2d 602, 604 (1998) (citations omitted). These same elements are required to prove negligence in a premises liability case. See Id.at 621-22, 507 S.E.2d at 604 ("As to whether defendant owed a duty to plaintiff, it is well settled in this jurisdiction that an individual who enters the premises of a retail establishment during business hours, as did plaintiff herein, is a business invitee for purposes of evaluating the duty owed by the owner of the premises to that individual. Foster v. Winston-Salem Joint Venture,303 N.C. 636, 638, 281 S.E.2d 36, 38 (1981).").
Plaintiff's sole argument at the summary judgment hearing was that Defendants, due to a legally recognized "special relationship" with their son, had a duty to control Scott's behavior once they knew Scott had assaulted Michael at the house. Plaintiff argued:
And [Defendants] had a duty to act under-plaintiff has two theories there. And one is, yes, the parent-child relationship. And I do concede and recognize that there is not an existing case extending that to a child of 19 years of age. But again, the underlying rationale behind these special relationships as has been repeated by our courts is the knowledge of the danger the person posed and the ability to control the person.
And [Defendants] had actual knowledge of the danger that their son posed at that time. And they had the ability to control him, because all of the testimony on that point from the trial and from the police report that led-Scott Fisher did what his parents and what his uncle told him to do, which was just to shut down the party and leave. And Scott Fisher said he was going to get the kid out of there.
Plaintiff acknowledges that she has abandoned any argument on appeal that Defendants had a duty to control Scott in order to protect Michael based upon the parent-child relationship. Plaintiff argues that, as landowners, once Defendants became aware that while Scott and Michael were still at the house and Scott had assaulted Michael, they had a duty to control Scott as a lawful visitor or "licensee."[5] Plaintiff argued the following at the summary judgment hearing:
So [Defendants'] failure to act under the duty that they have, both as parents to a dangerous child, but also as landowner-and the old nomenclature-licensee that I've discussed in my brief. It's recognized North Carolina law. I cited it in one case, and that case has been cited multiple times. One of the special relationships that can convey liability to someone for a third party tortfeasor's action, that is landowner and licensee. And Shawn and Tracy Fisher were the landowners with the actual knowledge of the danger that was happening on their premises at the time it was happening. Licensee is a lower standard than the current, just, negligent standard that landowners hold toward everyone to act reasonably under the circumstances.
And I haven't heard any rebuttal from the defense on that argument that they had a landowner-licensee relationship with their son Scott Allen Fisher. So-and, again, actual knowledge of the danger he imposed and refused to do anything to help Michael survive.
Plaintiff's argument, both before the trial court and on appeal, is focused on Plaintiff's contention that Defendants had a duty to control Scott, and that Defendants breached that duty. On appeal, Plaintiff only sufficiently argues that Defendants' duty to control Scott was based upon a landowner-licensee relationship between Defendants and Scott.[6]
Whether a landowner-licensee relationship involving non-commercial property can impose a duty on the landowner to control the actions of the licensee, and thereby support an action in premises liability negligence for failing to prevent the licensee's intentional acts, appears to be an unsettled question in North Carolina. Assuming, arguendo,that the facts in this case, and the law in North Carolina, are as Plaintiff contends, Plaintiff's forecast of evidence on the element of proximate cause fails to survive Defendants' motion for summary judgment.
Assuming arguendothat Defendants had a duty to control Scott, and Defendants breached that duty, Plaintiff still had to show that "a person of ordinary prudence should have foreseen that [Michael's] injury was probable under the circumstances" as a result of that breach. Liller,131 N.C.App. at 621, 507 S.E.2d at 604 (citation omitted). In the context of the shooting of a patron at a convenience store, this Court has upheld summary judgment for a defendant based upon the plaintiff's failure to forecast sufficient evidence of proximate cause. Id.at 624-25, 507 S.E.2d at 606. Though Lillerinvolved a landowner's duty to protect patrons as invited guests from the intentional acts of third parties, on property open to the public for business purposes, we do not believe the proximate cause analysis would be any different in this case. The plaintiff in Lillerargued that the defendant convenience store should have hired security guards, installed surveillance systems, and taken other measures to protect patrons against assault by third parties. Id.at 625, 507 S.E.2d at 606. The plaintiff offered the statement of an expert that such attacks " 'came as a direct result of a lack of security' as evidence of proximate cause[.]" Id.This Court held that the expert's "conclusory statement without factual support was insufficient to raise a genuine issue of material fact as to the proximate cause element of plaintiff's negligence claim." Id.
In the present case, Plaintiff argued at the summary judgment hearing: "If [Defendants] had acted sooner within those two hours, law enforcement might have been able to reach Michael while he was still alive before he had succumbed to hypothermia." On appeal, Plaintiff argues:
Had the Defendants made a phone call to emergency responders, the multiple law enforcement agencies mobilized in the search and rescue efforts for Michael could have intercepted Michael at the [h]ouse, or at least saved valuable hours finding the crime scenes, and possibly locating Michael while he was still alive.
Plaintiff's statements, which in this case are speculative rather than conclusory, do not raise a genuine issue of material fact as to the proximate cause element of her claim. Id.We hold that the trial court properly granted Defendants' motion for summary judgment.
II.
In Plaintiff's next argument, she contends that: "Defendant's supporting affidavits or portions thereof should be disregarded." We hold that Plaintiff cannot show that she was prejudiced by the contested portions of Defendants' affidavits.
This issue revolves around certain DPS records related to Scott's place of residence which were not considered by the trial court in making its determination on summary judgment. Because Plaintiff blames Defendants for Plaintiff's inability to provide the trial court with the relevant records in a timely manner, Plaintiff requests this Court to consider the records and disregard portions of Defendants' affidavits which are contrary to the records.
The sole contested issue for which the records are relevant is Scott's legal residence on 20-21 February 2010. Defendants indicated that Scott was not a resident, but had been staying with Defendants at the relevant time. Scott testified at trial that he had lived at the house for about ten years. The excluded DPS records list the house as Scott's residence before and after 20-21 February 2010.
Plaintiff argues in her brief: "If Scott Fisher lived with his parents, a jury could reasonably conclude that creates a higher likelihood that Defendants would or should be on notice of his dangerous propensities, and by virtue of 'keeping a roof over his head' a greater ability to control his behavior, dangerous and otherwise." As Plaintiff acknowledges, Scott's legal residence was a disputed fact before the trial court. Therefore, assuming arguendodetermination of Scott's legal residence was material, it could not have factored into the decision to grant summary judgment as Scott's residence on 20-21 February 2010 was already in dispute. The DPS records would have simply given more weight to Plaintiff's contention that Scott resided at the house. This Court, in reaching our holdings in the present opinion, makes no determination concerning Scott's legal residence during the relevant time period. Further, Scott's residence at the time of Michael's death is not relevant to our holding on proximate cause.
III.
In Plaintiff's final argument, she contends that "the trial court's inclination to deny a Rule 60(b) motion lacks a reasonable basis." This issue is moot.
According to Plaintiff, she "moved to set aside the order granting summary judgment pursuant to Rule 60(b)(2) and 60(b)(3), predicated on the DPS records discovered after the hearing of [P]laintiff's motion for summary judgment." As indicated in our holdings above, summary judgment was appropriate based upon Plaintiff's failure to forecast sufficient evidence supporting proximate cause. The DPS records, tending to support Plaintiff's contention that Scott lived at the house with Defendants, would have no impact on our holding. Cumberland Cty. Hosp. v. NC Dept. of Health,---N.C.App. ----, ----, 764 S.E.2d 491, 497 (2014) (citation and quotation marks omitted) (" 'A case is moot when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy.' "). Because this issue is moot, we decline to address it.
AFFIRMED.
Judges HUNTER, JR. and DIETZ concur.
Report per Rule 30(e).
Opinion
Appeal by Plaintiff from order entered 12 March 2014 by Judge Marvin P. Pope, Jr. in Superior Court, Transylvania County. Heard in the Court of Appeals 20 April 2015.

Because there are multiple persons relevant to the facts in this case who share the same last name, we will use first names except when using "Plaintiff" or "Defendants," and where titles-Detective, for example-are involved.

Whether the house was Scott's residence was disputed at the summary judgment hearing.

Scott was tried and convicted of involuntary manslaughter for Michael's death on 18 May 2012. The transcript from Scott's criminal trial was provided to the trial court for consideration on Defendants' motion for summary judgment.

We note that the interval between when Keith first called Shawn and when Shawn first spoke with law enforcement is disputed. In this Court's opinion following Scott's appeal from his criminal conviction, we stated as part of the defendant's evidence: "At around 11:30 p.m. on 20 February 2010, [Shawn] and his wife were driving their tractor-trailer rig in Pennsylvania, when [Shawn] received a phone call from [Keith], who lived next door to the family residence. Upon learning that there was a 'loud party' at his residence, [Shawn] asked [Keith] to break up the function. A few minutes later, [Shawn] spoke by phone with Lieutenant Holden, who told him that investigating officers were looking for [Michael]." State v. Fisher, --- N.C.App. ----, ----, 745 S.E .2d 894, 899-900 (2013). Plaintiff contends the interval between Keith's first call to Shawn and Shawn's first contact with law enforcement was closer to two hours.

Nelson v. Freeland, 349 N.C. 615, 631, 507 S.E.2d 882, 892 (1998), eliminated the traditional distinction between invitees and licensees, holding that all lawful visitors shall be owed the same duty of care. We will refer to Scott as a licensee as that is how Plaintiff refers to him, and opinions discussed below refer to the "landowner-licensee" relationship. See also Allstate Ins. Co. v. Oxendine, 149 N.C.App. 466, 469, 560 S.E.2d 858, 861 (2002).

As a purported response to the trial court's proposed order on Plaintiff's Rule 60(b) motion, Plaintiff attempted to entirely rewrite and expand her original brief. We denied Plaintiff's motion to "amend" her original brief in this manner, and we address this issue as it is argued in Plaintiff's original brief.