**ELISSA MACHADO, Appellant/Plaintiff**

**v.**

**YACHT HAVEN U.S.V.I., LLC d/b/a YACHT HAVEN GRANDE, ISLAND CAPITAL GROUP, LLC, ISLAND GLOBAL YACHTING LTD, CO., ISLAND GLOBAL YACHTING SERVICES, LLC, and ABC COMPANY, Appellees/Defendants**

S. Ct. Civil No. 2012-0137

Supreme Court of the Virgin Islands

October 16, 2014

LEE J. ROHN, ESQ., TERRI GRIFFITHS, ESQ., Leė J. Rohn & Associates, LLC, St. Croix, USVI, *Attorneys for Appellant.*

MATTHEW J. DUENSING, ESQ., Duensing, Casner, Dollison & Fitzsimmons, St. Thomas, USVI, *Attorney for Appellees.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.*

## OPINION OF THE COURT

(October 16, 2014)

CABRET, *Associate Justice.* Elissa Machado appeals the Superior Court's grant of summary judgment to Yacht Haven, U.S.V.I., LLC, in a lawsuit brought after Machado allegedly tripped over a sprinkler head and fell in a parking lot at the Yacht Haven Grande marina and galleria complex. Because Machado met her burden of demonstrating that genuine issues of material fact exist in this case, we reverse and remand for further proceedings.

### I. FACTUAL AND PROCEDURAL BACKGROUND

At about 6:25 p.m. on November 7, 2008, Elissa Machado ended her shift at a retailer in the Yacht Haven Grande complex on St. Thomas and walked to her car in the Yacht Haven Grande parking lot. The section of the parking lot where her car was located that night had three rows of parking spaces with a median dividing the two rows closest to the storefronts. The median was three feet wide, bounded on each side by a cement curb rising eight inches off the ground. At the time, the median contained trees and shrubbery, a sprinkler system servicing the vegetation, and had no designated walkway for pedestrians to cross it. Machado's car was on the opposite side of the median, and instead of walking around she took her "usual route," attempting to walk over the

median, as she and others had done before. At the time, there were no signs warning against walking across the median, nor did the property owner discourage people from doing so. As she attempted to walk across the median, she tripped over a sprinkler head, falling forward over the median's curb and breaking both bones in her lower right leg. At the time she tripped, it was "very, very dim" outside, as "[t]he lighting wasn't great." When she called for help, her coworker Nicole Lewis used the light from her cell phone to find Machado lying between two cars in the parking lot. Paramedics also had trouble seeing in the parking lot when they arrived 15 minutes later, using flashlights while bracing her leg.

On September 20, 2010, Machado brought this premises liability action against Yacht Haven, U.S.V.I., LLC, the owner of the parking lot and surrounding Yacht Haven Grande complex.[1] Following discovery, Yacht Haven moved for summary judgment on February 24, 2012. With its motion, it submitted a statement of undisputed facts, the report of civil engineer Wayne Callwood, the Yacht Haven security logbook entry from November 7, 2008, and the deposition testimony of Machado and Lewis, Yacht Haven employees Errol Denzy and Austin Potter, and corporate officers Eric Toth and Oliver Christian.

The Superior Court granted summary judgment to Yacht Haven on November 16, 2012, finding that Machado "had no reason to believe [Yacht Haven] invited her to use the decorative median as a walkway." *Machado v. Yacht Haven U.S.V.I., LLC*, Super. Ct. Civ. No. 542/2010 (STT), 2012 V.I. LEXIS 61, *10 (V.I. Super. Ct. Nov. 16, 2012) (unpublished). As a result, the Superior Court concluded that Yacht Haven did not owe her a duty of care as an invitee. *Id.* The court held that even if Machado was a licensee when she entered the median — as opposed to a trespasser — there was no evidence that Yacht Haven had notice that the sprinkler system created an unreasonable risk of harm or that Yacht Haven failed to exercise reasonable care in making this area safe. *Id.* The court further found that, even assuming the median was poorly illuminated and Yacht Haven had notice of this condition, Machado had "reason to know

---

[1] The complaint and later amendments also named Island Capital Group, LLC, Island Global Yachting, Ltd., Island Global Yachting Services, LLC, and an unnamed entity identified as "ABC Company" as defendants. The Superior Court granted summary judgment to these parties, finding there was no evidence that they managed or controlled the property. Machado does not challenge the grant of summary judgment to these parties.

of the condition and risk involved when traversing the decorative median in the dark," which she knew featured "trees, ornamental plants, and other vegetation." *Id.*, 2012 V.I. LEXIS 61 at *14. "The physical condition of the land coupled with the level of illumination," the court continued, "indicated that there might be hidden dangers present and put [Machado] on notice . . . that she entered the decorative median at her own risk." *Id.* Machado filed a timely notice of appeal on December 4, 2012.

## II. JURISDICTION

"The Supreme Court [has] jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." 4 V.I.C. § 32(a). The Superior Court's November 16, 2012 order granting summary judgment to Yacht Haven was a final order within the meaning of section 32(a), and therefore we have jurisdiction over this appeal. *Perez v. Ritz-Carlton (V.I.), Inc.*, 59 V.I. 522, 527 (V.I. 2013) (citing *Sealey-Christian v. Sunny Isle Shopping Ctr., Inc.*, 52 V.I. 410, 418 (V.I. 2009)).

## III. DISCUSSION

Machado argues that the Superior Court erred by holding, as a matter of law, that Yacht Haven did not owe her a duty of care as an invitee based on the court's conclusion that she exceeded the scope of her invitation when she entered the median. Instead, she asserts this was a question of fact that could not be resolved at summary judgment. She further asserts that she presented sufficient evidence to create a genuine issue of material fact concerning Yacht Haven's notice of a dangerous condition in the parking lot and its failure to properly maintain the sprinkler system or provide adequate lighting in the area where she fell, and that the Superior Court erred in deciding at the summary judgment stage that she assumed the risk of crossing the median.

"The Superior Court's grant of summary judgment is subject to plenary review by this Court." *Perez*, 59 V.I. at 527 (citing *Williams v. United Corp.*, 50 V.I. 191, 194-95 (V.I. 2008)). In conducting this review, we apply the same test as the Superior Court and view all inferences from the evidence in the light most favorable to Machado, the nonmoving party, and take her allegations as true if properly supported. *Id.* But Machado "may not rest upon mere allegations [and] must present actual evidence showing a genuine issue for trial." *Williams*, 50 V.I. at 194. "Summary

judgment is a drastic remedy, [and] should be granted only when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact." *Id.*

██ ██ In order to determine whether summary judgment was appropriate, we must analyze the Superior Court's decision in the context of the substantive law governing the cause of action. *Perez*, 59 V.I. at 528. The Superior Court recently noted that "the Supreme Court has not explicitly conducted a *Banks* analysis to adopt the common law elements of negligence." *Hodge v. V.I. Telephone Corp.*, 60 V.I. 105, 112 n. 20 (V.I. Super. Ct. 2014). As established in *Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967, 981-84 (V.I. 2011), and subsequent cases, when confronted with an issue of Virgin Islands common law that this Court has not resolved — or that has been addressed only through erroneous reliance on former 1 V.I.C. § 4 — courts must "engage in a three-factor analysis: first examining which common law rule Virgin Islands courts have applied in the past; next identifying the rule adopted by a majority of courts of other jurisdictions; and then finally — but most importantly — determining which common law rule is soundest for the Virgin Islands." *Better Bldg. Maint. of the V.I., Inc. v. Lee*, 60 V.I. 740, 757 (V.I. 2014) (citing *Gov't of the V.I. v. Connor*, 60 V.I. 597, 603 (V.I. 2014)); *see also Walters v. Walters*, 60 V.I. 768, 777 n. 11 (V.I. 2014) ("[W]e recently explained [in *Connor*] that the Superior Court is not bound by this Court's 'prior erroneous reliance' on 1 V.I.C. § 4."). Examining these factors, we agree with the Superior Court's assessment that the foundational elements of negligence — (1) a legal duty of care to the plaintiff, (2) a breach of that duty of care by the defendant (3) constituting the factual and legal cause of (4) damages to the plaintiff — "are so widely accepted and fundamental to the practice of law in the . . . Virgin Islands" and every other United States jurisdiction that maintaining these elements is unquestionably the soundest rule for the Virgin Islands. *Hodge*, 60 V.I. at 112 n.20; *see also Sickler v. Mandahl Bay Holding, Inc.*, Super. Ct. Civ. No. 331/2010 (STT), 2014 V.I. LEXIS 39, *10 n.19 (V.I. Super. Ct. July 7, 2014) (unpublished) (agreeing that maintaining these basic elements of negligence represents the soundest rule for the Virgin Islands). Therefore, to the extent raised at summary judgment and preserved on appeal, we must determine whether Machado submitted sufficient evidence to create a genuine issue of material fact on each of these elements. *Perez*, 59 V.I. at 528.

## A. Yacht Haven's Duty to Machado

The Superior Court held that Yacht Haven did not have a duty to Machado because, even though she originally had "the status of a business visitor on the premises" she "exceeded the scope of her invitation" when she walked over the median, as Machado "had no reason to believe that [Yacht Haven] desired [her] presence in the decorative median in furtherance of her purpose for being on the property." 2012 V.I. LEXIS 61 at *10. On this basis, the Superior Court concluded as a matter of law that "at the time and place of her injury, [Yacht Haven] did not owe [Machado] a duty of care as a business visitor or invitee." *Id.* The Superior Court then declined to determine whether Machado became a licensee or a trespasser upon entering the median, but held that because there was no evidence that Yacht Haven breached its duty of care to a licensee and because it owed no duty at all to a trespasser, summary judgment was appropriate. *Id.*, 2012 V.I. LEXIS 61 at *17. Machado asserts that the Superior Court erred in holding as a matter of law that Yacht Haven owed her a lesser duty of care — or none at all — when she entered the median, since there was ample evidence in the record that Yacht Haven knew that patrons and employees frequently walked over the median to reach the rows of the parking lot farthest from the buildings in the complex. On the other hand, Yacht Haven insists that its duty of care to Machado is a matter of law that the Superior Court correctly decided at summary judgment.

Traditionally, the duty of care owed by a land possessor to an entrant on the land was determined by classifying the entrant as either an invitee, a licensee, or a trespasser. *Ford v. Bd. of Cnty. Comm'rs of Cnty. of Dona Ana*, 879 P.2d 766, 769 (N.M. 1994). So instead of holding a land possessor to the general duty of reasonable care utilized in all other areas of negligence law, a court would determine an entrant's status as a matter of law to define the duty she was owed at the time of her injury, like the Superior Court did in this case.[2] *See, e.g., Hogan v. Hess Constr. Co.*, 187

---

[2] Other courts applying Virgin Islands law have also continued to apply these traditional status distinctions. *See, e.g., Figueroa v. Hess Oil V.I. Corp.*, 198 F. Supp. 2d 632, 645 (D.V.I. App. Div. 2002) (observing that "invitees . . . have the right to be protected"); *DeJesus v. V.I. Water & Power Auth.*, 55 V.I. 402, 412-13 (V.I. Super. Ct. 2011) ("A possessor of land is subject to liability for physical injury caused to his or her invitees."); *Crowell v. Ritz Carlton Hotel (V.I.), Inc.*, D.C. Civ. No. 12-15, 2013 U.S. Dist. LEXIS 160265, *1 n.1 (D.V.I. June

Kan. 559, 358 P.2d 755, 757 (1961). "[A]n entrant becomes an invitee when the possessor invites [her] with the expectation of a material benefit from the visit or extends an invitation to the public generally." *Carter v. Kinney*, 896 S.W.2d 926, 928 (Mo. 1995). A land possessor has the duty to "warn the invitee of any known dangers," in addition to the "obligation to . . . make the premises safe [for invitees], which requires the landowner to inspect the premises and . . . make any necessary repairs or warn of any discovered hazards." *Stitt v. Holland Abundant Life Fellowship*, 462 Mich. 591, 614 N.W.2d 88, 92 (2000). Where an entrant is on the "land with the permission of the owner but for the entrant's [own] purposes," she is only a licensee. *Ouellette v. Blanchard*, 116 N.H. 552, 364 A.2d 631, 632 (1976). Unlike the duty owed to an invitee, a land possessor has no duty to inspect the premises with regard to a licensee and only "owes a licensee the duty to make safe dangers of which the possessor is aware." *Carter*, 896 S.W.2d at 928; *see also Hogan*, 358 P.2d at 757 (affirming a dismissal after holding that the entrant was a licensee as a matter of law and the possessor was "not alleged to have willfully, intentionally or recklessly injured, [her]"). And with regard to a trespasser — "a person who enters or remains upon land of another without a privilege to do so," *Rowland v. Christian*, 69 Cal. 2d 108, 70 Cal. Rptr. 97, 443 P.2d 561, 565 (1968) — the possessor generally "owes . . . no duty of care." *Carter*, 896 S.W.2d at 928 (but noting that "[t]he exceptions to these general rules are myriad").

This premises liability classification scheme — described by some courts as a "trichotomy" or "tripartite system" — "finds its roots in the English common law," *Koenig v. Koenig*, 766 N.W.2d 635, 638 (Iowa 2009), and was uncritically incorporated into American common law until the United States Supreme Court refused to recognize the distinction between invitees and licensees in maritime law in *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630, 79 S. Ct. 406, 3 L. Ed. 2d 550 (1959). In 1968, California became the first state to follow suit, eliminating the distinctions between invitees, licensees, and trespassers in all premises liability actions. *Rowland*, 443 P.2d at 568; *see also* Robert S. Driscoll, Note, *The Law of Premises Liability in America: Its Past, Present, and Some Considerations for Its Future*, 82 NOTRE

3, 2013) ("Only the possessor of land on which an invitee is injured by a condition on that land is liable for the harm.").

DAME L. REV. 881, 888 (2006) ("*Rowland* set off a firestorm in local tort law. Immediately following the Rowland decision, a number of state courts set about totally abandoning the tripartite system of premises liability."). "In total, the jurisdictions are now split, with a majority of states departing from the common-law classifications in some manner,[3] and a substantial minority either rejecting abolition or not taking a recent position."[4] *Koenig*, 766 N.W.2d at 639-40 (collecting cases); *see also Nelson v. Freeland*, 349 N.C. 615, 507 S.E.2d 882, 887 (1998) ("[H]alf of all jurisdictions . . . have judicially abandoned or modified the common-law trichotomy in favor of the modern 'reasonable-person' approach that is the norm in all areas of tort law."). These jurisdictions instead recognize that regardless of an entrant's status on the property, "the foreseeability of the injury should be the controlling factor in determining the liability of the [possessor]," just as in all other negligence actions. *Heins v. Webster Cnty.*, 250 Neb. 750, 552 N.W.2d 51, 56 (1996).

---

[3] *See Smith v. Arbaugh's Rest., Inc.*, 469 F.2d 97, 105, 152 U.S. App. D.C. 86 (D.C. Cir. 1972); *Webb v. City & Borough of Sitka*, 561 P.2d 731, 734 (Alaska 1977); *Rowland*, 443 P.2d at 568; *Mile High Fence Co. v. Radovich*, 175 Colo. 537, 489 P.2d 308, 311-13 (1971); *Wood v. Camp*, 284 So. 2d 691, 695 (Fla. 1973); *Koenig*, 766 N.W.2d at 640; *Pickard v. City & Cnty. of Honolulu*, 51 Haw. 134, 452 P.2d 445, 446 (1969); *Jones v. Hansen*, 254 Kan. 499, 867 P.2d 303, 310 (1994); *Cates v. Beauregard Elec. Coop., Inc.*, 328 So. 2d 367, 370-71 (La. 1976); *Poulin v. Colby College*, 402 A.2d 846, 850-51 (Me. 1979); *Mounsey v. Ellard*, 363 Mass. 693, 297 N.E.2d 43, 51 (1973); *Peterson v. Balach*, 294 Minn. 161, 199 N.W.2d 639, 642 (1972); *Limberhand v. Big Ditch Co.*, 218 Mont. 132, 706 P.2d 491, 496 (1985); *Heins v. Webster Cnty.*, 250 Neb. 750, 552 N.W.2d 51, 54 (1996); *Moody v. Manny's Auto Repair*, 110 Nev. 320, 871 P.2d 935, 942 (1994); *Ouellette*, 364 A.2d at 632; *Ford*, 879 P.2d at 769; *Basso v. Miller*, 40 N.Y.2d 233, 352 N.E.2d 868, 872, 386 N.Y.S.2d 564 (1976); *Nelson v. Freeland*, 349 N.C. 615, 507 S.E.2d 882, 887 (1998); *O'Leary v. Coenen*, 251 N.W.2d 746, 751 (N.D. 1977); *Mariorenzi v. Joseph DiPonte, Inc.*, 114 R.I. 294, 333 A.2d 127, 131-33 (1975); *Hudson v. Gaitan*, 675 S.W.2d 699, 703 (Tenn. 1984); *Mallet v. Pickens*, 206 W. Va. 145, 522 S.E.2d 436, 446 (1999); *Antoniewicz v. Reszcynski*, 70 Wis. 2d 836, 236 N.W.2d 1, 11 (1975); *Clarke v. Beckwith*, 858 P.2d 293, 296 (Wyo. 1993).

[4] *See McMullan v. Butler*, 346 So. 2d 950, 951-52 (Ala. 1977); *Nicoletti v. Westcor, Inc.*, 131 Ariz. 140, 639 P.2d 330, 332 (1982); *Bailey v. Pennington*, 406 A.2d 44, 47-48 (Del. 1979); *Mooney v. Robinson*, 93 Idaho 676, 471 P.2d 63, 65 (1970); *Kirschner v. Louisville Gas & Elec. Co.*, 743 S.W.2d 840, 844 (Ky. 1988); *Sherman v. Suburban Trust Co.*, 282 Md. 238, 384 A.2d 76, 83 (1978); *Little ex rel. Little v. Bell*, 719 So. 2d 757, 764 (Miss. 1998); *Vega ex rel. Muniz v. Piedilato*, 154 N.J. 496, 713 A.2d 442, 448-49 (1998); *Sutherland v. Saint Francis Hosp., Inc.*, 1979 OK 18, 595 P.2d 780, 782 (1979); *Di Gildo v. Caponi*, 18 Ohio St. 2d 125, 247 N.E.2d 732, 736 (1969); *Ragnone v. Portland Sch. Dist. No. 1J*, 291 Ore. 617, 633 P.2d 1287, 1291 (1981); *Musch v. H-D Elec. Coop., Inc.*, 460 N.W.2d 149, 151-52, 156-57 (S.D. 1990); *Buchholz v. Steitz*, 463 S.W.2d 451, 454 (Tex. Civ. App. 1971); *Tjas v. Proctor*, 591 P.2d 438, 441 (Utah 1979).

Recently, we explained that this Court has "not had occasion to consider the appropriate rule to apply in premises liability cases" under the *Banks* framework. *Perez*, 59 V.I. at 529 n.5. We declined to address this issue in *Perez* because there it was only necessary to resolve a very narrow point of law: "whether a possessor's knowledge of a recurring danger can establish constructive notice." *Id.* at 531. The possessor there conceded that Perez was an invitee — therefore owed the greatest duty of care — and the only issue properly before this Court was the "argument that [the possessor] had no notice of a dangerous condition." *Id.* at 528. So while we held there (after examining the three *Banks* factors) that the foreseeability of harm "is the touchstone of the existence of [a land possessor's] duty of reasonable or ordinary care," that holding assumed without deciding that the traditional status distinctions applied, since the result would have remained the same regardless of whether maintaining those distinctions represented the soundest common law rule for the Virgin Islands. *Id.* at 532-34 & n.5. Here, because the Superior Court applied these traditional distinctions in granting Yacht Haven summary judgment, we must determine whether to extend the *Perez* rule to all premises liability actions brought under Virgin Islands law.

The division of entrants on another's land between invitees, licensees, and trespassers was "inherited from a culture deeply rooted to the land, a culture which traced many of its standards to a heritage of feudalism." *Kermarec*, 358 U.S. at 630; *see Koenig*, 766 N.W.2d at 638 ("The trichotomy emerged in an era [when] land ownership was paramount and the primary source of power, wealth, and dominance.") (citing *Nelson*, 507 S.E.2d at 887). "In addition to a history entrenched in feudalism," courts also limited the duty of landowners due to "other factors . . . includ[ing] the social desirability of the free use and exploitation of land, the influential political position maintained by the landowning aristocracy, and an English economic and social system driven by agrarian concerns." John Ketchum, Note, *Missouri Declines an Invitation to Join the Twentieth Century: Preservation of the Licensee-Invitee Distinction in Carter v. Kinney*, 64 UMKC L. REV. 393, 395 (1995). "The landowner's privileged status to do as he pleased on his own land was a unanimous position taken by the common law courts well into the nineteenth century," Kathryn E. Eriksen, *Premises Liability in Texas — Time for A "Reasonable" Change*, 17 ST. MARY'S L. J. 417, 421 & n.16 (1986) (collecting cases), and "these courts restricted the jury's power

because juries were comprised mainly of potential land entrants who most likely would act to protect the community at large and thereby reign in the landowner's sovereign power over his land." *Nelson*, 507 S.E.2d at 887 (citing Michael Sears, Comment, *Abrogation of the Traditional Common Law of Premises Liability*, 44 U. KAN. L. REV. 175, 176 (1995)) (emphasis omitted).

At the time the status distinctions developed, the foundational principle of modern negligence law — that a person should be held accountable for causing foreseeable harm — "was largely unrecognized." *Nelson*, 507 S.E.2d at 887. Instead, "[t]he underlying theory was apparently that the person acting and the person suffering must be regarded as having in a sense 'contracted' with each other as to the care the one would take and the risks the other would assume." W. E. Shipley, Annotation, *"Economic benefit" or "public invitation" as test of licensee-invitee status*, 95 A.L.R.2d 992, § 2 (1964). And even as modern negligence law began to take shape in the United States, courts simply superimposed these developing principles onto the existing status trichotomy — resulting in premises liability cases focused almost entirely on "attempting to fit modern human interaction into rigid categories developed three centuries ago," *Koenig*, 766 N.W.2d at 643, and allowing "trial court determinations that the plaintiff was a trespasser rather than a licensee, or a licensee rather than an invitee, [to keep] the injured party from having a jury determination on the issue of negligence." *Mile High Fence Co. v. Radovich*, 175 Colo. 537, 489 P.2d 308, 312 (1971). This system "facilitat[ed] the direction of verdicts in favor of possessors," Ketchum, 64 UMKC L. REV. at 396, and in this way, "[a]lmost immediately, the emergence of negligence law conflicted with the immunity conferred upon landowners under the trichotomy." *Nelson*, 507 S.E.2d at 887.

██ Once the history and purpose of dividing entrants into invitees, licensees, and trespassers to define a land possessor's duty of care in premises liability actions is understood, it becomes clear that the maintenance of this trichotomy conflicts with this Court's jurisprudence and modern negligence law generally. *See Smith v. Arbaugh's Rest., Inc.*, 469 F.2d 97, 105, 152 U.S. App. D.C. 86 (D.C. Cir. 1972) ("Legal classifications such as trespasser and licensee are judicial creations which should be cast aside when they are no longer useful as controlling tools for the jury."); *Koenig*, 766 N.W.2d at 645 ("When the reasons for the rule disappear, the rule ought to disappear.") (citing *Funk v. United States*,

290 U.S. 371, 383, 54 S. Ct. 212, 78 L. Ed. 369 (1933)). As we explained in *Perez*, "[l]iability for . . . foreseeable harms is based on the possessor's superior knowledge of the property, as the possessor is in the best position to know of potentially dangerous conditions on the property." 59 V.I. at 533. Characterization of an entrant as an invitee, licensee, or trespasser has no bearing on the possessor's "superior knowledge of the property," and to allow summary judgment where there is evidence that a plaintiff's injury was foreseeable to a land possessor, yet the possessor did not take reasonable action to prevent that injury, inappropriately places the focus of attention on the plaintiff's actions alone. *See Scurti v. City of New York*, 40 N.Y.2d 433, 354 N.E.2d 794, 795, 387 N.Y.S.2d 55 (1976) ("[T]he liability of a landowner to one injured upon his property should be governed, not by the ancient and antiquated distinctions between trespassers, licensees, and invitees decisive under common law, but rather by the standard applicable to negligence cases generally."); *cf. Koenig*, 766 N.W.2d at 644 (a possessor does "not alter [its] behavior based on an entrant's status"); *Rowland*, 443 P.2d at 568 ("Reasonable people do not ordinarily vary their conduct depending upon such matters."). And permitting summary judgment based on a legal determination that a plaintiff's actions made her a licensee instead of an invitee is akin to granting summary judgment because a plaintiff contributed to her own injury — something expressly prohibited by statute in the Virgin Islands. *See* 5 V.I.C. § 1451(a) (comparative negligence must be allocated by the jury). Therefore, the soundest common law rule for the Virgin Islands is to extend the holding of *Perez* — that the foreseeability of harm "is the touchstone of the existence of [a land possessor's] duty of reasonable or ordinary care," 59 V.I. at 533 — to all premises liability actions.

██ We recognize that many courts — while eliminating the distinction between invitees and licensees-have retained the trespasser classification, and the Superior Court here held that if Machado was a trespasser, Yacht Haven owed her no duty of care at all.[5] But those courts abolishing the trichotomy in its entirety present the more persuasive rationale, and like

---

[5] It appears that half of the jurisdictions to have squarely addressed this issue have retained the trespasser classification while abolishing the invitee and licensee classifications, creating essentially a two-tiered system in premises liability actions. *See, e.g., Jones*, 867 P.2d at 310; *Mounsey*, 297 N.E.2d at 57 n. 7; *Poulin*, 402 A.2d at 851 n. 5; *Heins*, 552 N.W.2d at 57; *Ford*, 879 P.2d at 770; *Nelson*, 507 S.E.2d at 892; *O'Leary v. Coenen*, 251 N.W.2d 746, 751 (N.D. 1977); *Mallet v. Pickens*, 206 W. Va. 145, 522 S.E.2d 436, 439-40 (1999); *Clarke v. Beckwith*,

those courts, "[w]e are not disposed to limit our holding to abolishment of two-thirds of the trichotomy and to retain the category of trespassers as a legal area of immunity." *Ouellette*, 364 A.2d at 634. In many cases, it will prove "just as hard to distinguish trespassers from licensees or invitees, as to distinguish licensees from invitees; and the class of trespassers is probably just as various as either of the other classes. The very effort at dry classification and differentiation puts the emphases at the wrong places." *Id.* (quoting *Mounsey v. Ellard*, 363 Mass. 693, 297 N.E.2d 43, 57 (1973) (Kaplan, J., concurring)). Not only would retaining the trespasser classification "put[ ] the emphases at the wrong places" in exactly the same manner as the invitee and licensee classifications, it would also ignore the reality that "[t]he trespasser who steps from a public sidewalk onto a private parking lot today is not the 'outlaw' or 'poacher' whose entry was both unanticipated and resented in the nineteenth century." *Smith*, 469 F.2d at 102-03 ("It is contrary to reason to accept as a settled principle of law that a parking lot owner actually varies his conduct according to the status of those who walk across his boundaries.").

Even those courts retaining the trespasser classification have created a multitude of exceptions intended to mitigate its harshness, such as a possessor's duty to trespassing children, known or expected trespassers,

---

858 P.2d 293, 296 (Wyo. 1993). The other half has abolished the trichotomy entirely, adopting instead a uniform standard of care — even with regard to trespassers. *See, e.g., Smith*, 469 F.2d at 105; *Hurn v. Greenway*, 293 P.3d 480, 483 (Alaska 2013); *Rowland*, 443 P.2d at 568; *Pickard*, 452 P.2d at 446; *Cates*, 328 So. 2d at 370-71; *Limberhand*, 706 P.2d at 496; *Moody*, 871 P.2d at 942; *Ouellette*, 364 A.2d at 634; *Basso*, 352 N.E.2d at 873. Several others have eliminated the invitee and licensee distinctions while declining to determine whether to retain the trespasser classification. *See, e.g., Koenig*, 766 N.W.2d at 645 n.2; *Peterson v. Balach*, 294 Minn. 161, 199 N.W.2d 639, 642 (1972); *Antoniewicz*, 236 N.W.2d at 4; *Hudson v. Gaitan*, 675 S.W.2d 699, 703 (Tenn. 1984). One jurisdiction — Rhode Island — at first eliminated all three status distinctions, then reversed course and reinstated the trespasser classification almost two decades later. *Tantimonico v. Allendale Mut. Ins. Co.*, 637 A.2d 1056, 1061-62 (R.I. 1994). Moreover, almost all of the decisions retaining the trespasser classification were decided decades ago, and relied heavily on the Restatement (Second) of Torts, which recognized the trichotomy. Most courts have yet to reevaluate this precedent in light of the recent publication of the Third Restatement, which recognizes that the developing trend is to impose a uniform standard of care in nearly all premises liability cases. RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 51 cmt. a ("This Section rejects the status-based duty rules and adopts a unitary duty of reasonable care to entrants on the land."); *but see Foster v. Costco Wholesale Corp.*, 291 P.3d 150, 156 (Nev. 2012) (adopting the uniform duty of care as stated in the Third Restatement).

and the existence of attractive nuisances or highly dangerous activities on the land — all of which are defined in terms of what is foreseeable to the possessor. *See, e.g., Maffucci v. Royal Park Ltd. P'ship*, 243 Conn. 552, 707 A.2d 15, 20 (1998) ("[I]f . . . the presence of trespassers is to be expected, then [the possessor has the] duty of taking such precautions against injuring trespassers as a *reasonable foresight of harm* ought to suggest." (emphasis added)).[6] It appears obvious that by retaining the trespasser classification, subject to these exceptions based on foreseeability, our jurisprudence would essentially come right back to the foreseeability of harm standard — albeit after confusing the issue beyond recognition. *Ouellette*, 364 A.2d at 634 ("[T]o retain trespassers as a separate category will continue the difficulties inherent in separating licensees from trespassers and 'good trespassers' from 'bad trespassers.' "); *Rowland*, 443 P.2d at 569 ("[T]o approach the problem in these manners would only add to the confusion, complexity, and fictions which have resulted from the common law distinctions."); *see also Handy v. Nejam*, 111 So. 3d 610, 617 (Miss. 2013) (Kitchens, J., dissenting) ("What is most convincing . . . is not the growing number of states that are adopting a unitary standard of care, but the inescapable logic that the adoption of such a standard is efficient and beneficial to the

---

[6] *See also Green Springs, Inc. v. Calvera*, 239 So. 2d 264, 266 (Fla. 1970) ("What we are dealing with when we speak of 'attractive nuisance' is merely a set of circumstances relating to the innocence of danger on a child's part, the likelihood of trespass and consequent danger and the foreseeability of this chain of circumstance on the part of one who would not owe as great a duty of care toward an adult trespasser."); *Brett v. Great Am. Recreation, Inc.*, 144 N.J. 479, 677 A.2d 705, 720 (1996) ("Landowners owe a higher duty even to trespassers when their presence is foreseeable, particularly if an artificial condition or 'dangerous instrumentality' on the land poses a danger to them." (citation omitted)); *Strang v. S. Jersey Broad. Co.*, 9 N.J. 38, 86 A.2d 777, 780 (1952) ("Where trespass upon the land is foreseeable, and the condition involves an unreasonable risk of death or serious bodily injury to the trespassing child, the possessor of the land is liable."); *Blaylock v. Malernee*, 185 Okla. 381, 92 P.2d 357, 359 (1939) ("[T]he defendant, with knowledge of the highly dangerous substance he was handling and in disregard of the safety or life of . . . reasonably anticipated trespassers, was negligent in failing to give any kind of warning or notice that there was such a dangerous condition existing on the premises."); *Haddad v. First Nat'l Stores, Inc.*, 109 R.I. 59, 280 A.2d 93, 95 (1971) ("Today, the basis for the landowner's liability in cases involving trespassing children is his duty to take reasonable measures against a child's foreseeable conduct, a breach of that duty and resulting injury.").

administration of justice.").[7] "[T]his approach [would] only generate further confusion over the duty owed to various 'types' of trespassers," *Smith*, 469 F.2d at 105, and would simply perpetuate the same "semantic morass" that prompted the rejection of the trichotomy in the first place. *See Antoniewicz v. Reszcynski*, 70 Wis. 2d 836, 236 N.W.2d 1, 4 (1975) ("[A] convincing argument can be made to demonstrate that the numerous exceptions to the trespasser rule vitiate its effect and warrant an abrogation of the rule and the substitution therefor of a duty of ordinary care that recognizes the peculiar circumstances surrounding the trespass.").

■ While some courts have raised the fear that "the abandonment of the status of trespasser would place an unfair burden on a landowner who has no reason to expect a trespasser's presence," *Ford*, 879 P.2d at 770 (quoting *Poulin v. Colby Coll.*, 402 A.2d 846, 851 n.5 (Me. 1979)), this concern misapprehends the foreseeability of harm standard, since if "a landowner . . . has no reason to expect a trespasser's presence," the landowner could not have foreseen that the trespasser would be harmed and cannot be held liable. Contrary to the suggestions of these courts, holding a land possessor to a uniform duty of reasonable care with respect to all entrants on the land does not impose "strict" or "limitless" liability, and abandoning the trichotomy in its entirety "is not in conflict with the principle that the possessor is not an insurer of the visitor's safety." *Perez*, 59 V.I. at 534 (internal quotation marks and citation omitted); *see Koenig*, 766 N.W.2d at 645 ("The fear of a runaway, standardless jury has not been

---

[7] The majority opinion in *Handy* further illustrates the problems inherent in maintaining a categorical and unforgiving "trespasser" exception to the general duty of care. The *Handy* majority held that the mother of a boy who drowned in an apartment complex pool could not recover in a wrongful death action because the boy was a trespasser at the time he used the pool. 111 So. 3d at 614. The boy had not broken into the complex, but — as a guest of a tenant in the complex — had used the pool while unaccompanied by that tenant, in violation of the terms of the tenant's lease and the complex's regulations, and therefore was owed no duty of care. *Id.* In advocating for the abandonment of the trichotomy in its entirety, the dissent noted that under the majority's ruling, two boys — one who lived in the complex and one who did not — could drown in the same pool due to the same negligent action of the land pos-sessor, and yet the possessor would be completely insulated from liability with regard to the "trespassing" boy regardless of whether his death was foreseeable and the possessor could have taken steps to prevent it. *Id.* at 615 (Kitchens, J., dissenting). Surely a rule that makes such a meaningless distinction dispositive without any regard to the conduct of the possessor cannot serve as the soundest common law rule for the Virgin Islands.

substantiated in the jurisdictions that have abolished the common-law distinction[s].""); *Jones v. Hansen*, 254 Kan. 499, 867 P.2d 303, 310 (1994) (noting "there are limits to 'reasonable care' "). The Superior Court's observation that the "mere fact that an accident occurred does not give rise to an inference that the injured person was the victim of negligence" holds true, 2012 V.I. LEXIS 61 at *3, and we agree that the "status of a trespasser retains significance in our contemporary society." *Jones*, 867 P.2d at 310; *see also Mounsey*, 297 N.E.2d at 57 n.7; *Ford*, 879 P.2d at 770. Even under a uniform standard, it remains true that a possessor (unlike Yacht Haven) that does not hold its property open to the public "cannot be expected to maintain [its] premises in a safe condition for a wandering tramp or a person who enters against the [possessor's] known wishes." *Ouellette*, 364 A.2d at 634. "The character of and circumstances surrounding the intrusion" will remain "relevant and important in determining the standard of care applicable to the landowner," *id.*, and where there is no evidence to suggest that the entrant's presence on the property was foreseeable to the possessor because the possessor had no reason to expect the entrant to be on the land (e.g., an unexpected trespasser) — or had no reason to anticipate the entrant's injury (such as when there was no notice of a dangerous condition, *Perez*, 59 V.I. at 529-30) — judgment as a matter of law remains appropriate. *See Ouellette*, 364 A.2d at 634 ("When the intrusion is not foreseeable or is against the will of the [possessor] many intruders will be denied recovery as a matter of law."); *Elwood v. Alpha Sigma Phi*, 62 A.D.3d 1074, 878 N.Y.S.2d 499, 502 (2009) (granting summary judgment where the plaintiffs had failed to establish "that decedent's presence [on the property] was anything other than a singular, unexpected and unusual event"). The entrant's burden at summary judgment might prove impossible if she knew that she was entering a place she had no right to be or did so for an unlawful purpose. *See, e.g., Kirschner v. Louisville Gas & Elec. Co.*, 743 S.W.2d 840, 846 (Ky. 1988) (a foreseeability of harm standard imposes no duty on a land possessor to trespassing "wrongdoers who come upon the property for some illicit purpose"); *Boltax v. Joy Day Camp*, 67 N.Y.2d 617, 490 N.E.2d 527, 528, 499 N.Y.S.2d 660 (1986) (affirming summary judgment where a trespassing plaintiff's reckless use of the property was unforeseeable, thus

"absolv[ing] defendants of liability").[8] In this way, "[a]bolishing the common-law distinctions does not truly alter the underlying principles of premises liability. It simply prevents . . . an entrant's status [from] being the sole/primary factor." *Koenig*, 766 N.W.2d at 642-43.

Applying this standard here — and viewing the evidence and all inferences in the light most favorable to Machado — it is clear that Machado met her burden at summary judgment with regard to Yacht Haven's duty of care. The undisputed testimony indicated that countless people — including customers and employees of tenants at the Yacht Haven Grande complex, and Yacht Haven's own employees — regularly walked across the median to reach the far side of the parking lot, as opposed to the alternate route of walking around the entire length of the parking lot. Furthermore, it was undisputed that Yacht Haven had no posted signs or official policy warning patrons against walking across the narrow median to cross the parking lot. This leaves no doubt that, viewing

---

[8] A related fear expressed by those courts refusing to impose a uniform duty of reasonable care towards all foreseeable entrants is that a "wholesale change will delegate social policy decisions to the jury with minimal guidance from the court." *Younce v. Ferguson*, 106 Wn.2d 658, 724 P.2d 991, 995 (1986). But — although not yet at issue in this case — we have no doubt that the Superior Court is fully capable of instructing the jury on the proper considerations when determining the foreseeability of an entrant's presence on a property and the foreseeability of her injury. *See Koenig*, 766 N.W.2d at 642 ("[C]ontrary to critics, [the foreseeability standard] would not leave the jury utterly standardless. The foreseeability of the visitor's presence and the time, manner, place, and surrounding circumstances of his entry would continue to be relevant factors in determining whether the landowner acted reasonably."); *Heins*, 552 N.W.2d at 57 (in applying the foreseeability of harm standard, the jury must be instructed to consider: "(1) the foreseeability or possibility of harm; (2) the purpose for which the entrant entered the premises; (3) the time, manner, and circumstances under which the entrant entered the premises; (4) the use to which the premises are put or are expected to be put; (5) the reasonableness of the inspection, repair, or warning; (6) the opportunity and ease of repair or correction or giving of the warning; and (7) the burden on the land occupier and/or community in terms of inconvenience or cost in providing adequate protection"); *Younce*, 724 P.2d at 995 ("[O]ther courts have found that the following factors should be considered by the jury: (1) the circumstances under which the entrant was on the property; (2) the foreseeability of the injury or damage given the type of condition involved; (3) the nature of the property and its uses; (4) the feasibility of either correcting the condition on the property or issuing appropriate warnings; and (5) such other factors as may be relevant in the particular case."); *Mallet*, 522 S.E.2d at 447 ("Some factors that other jurisdictions have included in the analysis of whether a landowner or occupier has exercised reasonable care under the circumstances include the seriousness of an injury, the time, manner and circumstances under which the injured party entered the premises, and the normal use made of the premises." (citations omitted)).

the evidence in the light most favorable to Machado, a reasonable jury could conclude that Yacht Haven should have foreseen that the median would be used in such a manner and that it should have taken reasonable steps to prevent its patrons from being injured in doing so. Therefore, the Superior Court erred in holding as a matter of law that Yacht Haven did not owe Machado a duty of care once she entered the median.

## B. Yacht Haven's Breach of its Duty to Machado

Despite this error, because we apply the same standard the Superior Court should have applied at summary judgment, we may still affirm if Machado otherwise failed to present a genuine issue of material fact regarding Yacht Haven's breach of its duty of care — an issue Yacht Haven also raised in its summary judgment motion. *See* V.I.S.Ct.R. 4(i) (harmless error is not grounds for reversal). The Superior Court held that even if Yacht Haven did owe Machado a duty of care, summary judgment was still appropriate because she failed to present evidence that Yacht Haven had notice that the median and sprinkler system created an unreasonable risk of harm. Machado argues that in reaching that conclusion the Superior Court made improper findings of fact and failed to construe the evidence in her favor as required at summary judgment. She asserts that she identified evidence showing that the sprinkler system was in a state of disrepair, as the sprinkler heads — which were intended to retract into the ground when not in use — were not in use at the time of her fall but remained above ground, and further contends that Lewis's deposition testimony shows that the sprinklers were not operating properly and were obscured from view by the curb. Machado asserts that this evidence, coupled with the evidence of insufficient lighting in the parking lot on the night she fell, created a genuine issue of material fact that only a jury can resolve.

Even though Machado created a jury question on Yacht Haven's duty of reasonable care by producing evidence that her use of the median was foreseeable to Yacht Haven, to survive summary judgment Machado was also required to submit evidence supporting the contention that Yacht Haven breached its duty to take reasonable steps to protect her against foreseeable harm. To do this, Machado was required to produce evidence that could support a finding that Yacht Haven had actual or constructive notice of a dangerous condition. *Perez*, 59 V.I. at 529-30. The Superior Court correctly noted that Machado failed to introduce evidence showing

that Yacht Haven knew of other people tripping over the sprinkler heads; but that is not the only way to support a finding of notice for the purposes of premises liability. *Id.* Another way that notice of a dangerous condition can be imputed to a land possessor is through evidence that the condition persisted over a long enough period of time that the owner should have become aware of it through the exercise of reasonable care. *Williams*, 50 V.I. at 195-96 (in the absence of actual notice, evidence that the owner "should have discovered the danger and taken steps to remedy it" can establish constructive notice).

In opposing summary judgment, Machado presented evidence (through transcripts of the deposition testimony of Toth and Christian) that the sprinkler heads were designed to retract when not in use. She also presented her own deposition testimony that the sprinklers were not in use on the night of her injury but remained above ground, and that the parking lot was "very, very dim" at the time of her fall. Additionally, Lewis testified that she noticed the broken sprinkler heads when she first started working at Yacht Haven Grande several months before Machado's fall because they were "clear to see" during the day, were "high from the floor," and had caused her to trip in the past — although she did not suffer any injury or report the incident. Lewis also testified that the area of the parking lot where Machado fell was so dark that she had to use the light of her phone to find Machado, and the paramedics had to use flashlights while bracing her leg before loading her into the ambulance.

 Viewing this testimony and all reasonable inferences from the evidence in the light most favorable to Machado — as we must at this stage of the litigation — Lewis's testimony would support a finding that the sprinkler heads did not operate properly several months before Machado tripped over them. *See Daughtery v. City of New York*, 137 A.D.2d 441, 524 N.Y.S.2d 703, 706 (1988) (evidence that a dangerous condition persisted for "many months prior to the incident" is sufficient to create a jury question of notice); *Bartholomee v. Casey*, 103 Md. App. 34, 651 A.2d 908, 919-20 (Md. Ct. Spec. App. 1994) (evidence of a "constant state of disrepair" for one month was sufficient to create a jury question as to notice). Both Machado and Lewis's testimony would also support a finding that the parking lot was poorly lit that night. While perhaps not overwhelming, the only question before this Court in reviewing the grant of summary judgment is whether Machado submitted evidence that would allow a reasonable jury to conclude that Yacht

Haven's actions caused Machado's injuries. It seems undeniable that the answer to this question is that Machado met this burden. Yacht Haven had a duty to maintain its premises in a reasonably safe condition, yet the evidence on this record — when viewed in Machado's favor — indicates that Yacht Haven failed to maintain its sprinkler system in properly functioning order or to warn of this condition, allowing the sprinkler heads to remain several inches above ground when not in use, and further failed to maintain adequate lighting in the parking lot that would allow someone to see these malfunctioning sprinklers or any other danger in the area. Both of these conditions were entirely within Yacht Haven's control, and maintaining its property in a reasonably safe condition is the very essence of Yacht Haven's duty of care. *Perez*, 59 V.I. at 532-33; *see also Basily v. Rain, Inc.*, 29 S.W.3d 879, 884 (Tenn. Ct. App. 2000) (holding that a malfunctioning sprinkler head that remained above ground when not in use created a dangerous condition); *Hendrickson v. Ryan*, 262 A.D.2d 930, 692 N.Y.S.2d 519, 520 (1999) (notice of an obscured malfunctioning sprinkler head gave "rise to a duty either to repair the sprinkler head or to warn guests of its presence"). As explained above, the touchstone of premises liability in the Virgin Islands is foreseeability — if a possessor could anticipate that the conditions on its property would result in injury to those foreseeably using the property, the possessor can be held liable for those injuries.

 Furthermore, although Potter testified that the parking lot was well lit, and the report of Yacht Haven's expert found that the lighting and parking lot layout complied with the Virgin Islands building code, this only highlights the factual nature of this dispute. It is the role of the jury to determine whether to credit Machado and Lewis's testimony, or to credit Potter's. *Id.* at 537. And evidence that the lighting and parking lot layout complied with Virgin Islands law does not preclude a finding of liability. If the parking lot did indeed comply with Virgin Islands law, this would be persuasive evidence to present to a jury, yet it would not absolve Yacht Haven of liability as a matter of law. *See Collingwood v. Gen. Elec. Real Estate Equities, Inc.*, 324 N.C. 63, 376 S.E.2d 425, 428 (1989) ("While compliance with a statutory standard is evidence of due care, it is not conclusive on the issue." (quoting W. KEETON, D. DOBBS, R. KEETON & D. OWEN, *Prosser and Keeton on the Law of Torts* § 30 (5th ed. 1984))). Therefore, the Superior Court erred in holding that Machado

failed to meet her burden of showing there was a genuine issue of material fact regarding Yacht Haven's notice of a dangerous condition.

## C. Machado's Assumption of Risk

Nonetheless, Yacht Haven argues that this evidence only shows that the malfunctioning sprinkler head was an open and obvious condition, and Machado "assumed the risk of entering the median because the amount of lighting was observable." The Superior Court agreed with this argument, holding that Machado "had reason to know of the condition and risk involved when traversing the . . . median in the dark" because "[t]he physical condition of the land coupled with the level of illumination at the time indicated that there might be hidden dangers present [that] put [Machado] on notice to the effect that she entered the . . . median at her own risk." 2012 V.I. LEXIS 61 at *14.

█ To what extent the common law doctrine of assumption of risk remains viable in the Virgin Islands is questionable following the Legislature's adoption of the comparative negligence statute. *See* 5 V.I.C. § 1451(a) ("In any action based upon negligence to recover for injury to person or property, the contributory negligence of the plaintiff shall not bar a recovery, but the damages shall be diminished by the trier of fact in proportion to the amount of negligence attributable to the plaintiff."). With the enactment of section 1451(a), the Legislature abrogated the traditional common law rule that any negligence by the plaintiff — no matter how small — defeated all recovery. *Monk v. V.I. Water & Power Auth.*, 53 F.3d 1381, 1386, 32 V.I. 425 (3d Cir. 1995). "In its place, [the Legislature] adopted a comparative negligence statute that apportion[s] fault between the plaintiff and defendant." *Id.* In *Monk*, the United States Court of Appeals for the Third Circuit — sitting as the *de facto* court of last resort for the Virgin Islands — examined whether assumption of risk survived the enactment of section 1451(a), concluding that the comparative fault statute limited assumption of risk but did not eliminate it. *Id.* at 1387.

█ Although the Third Circuit noted that its holding "may not represent the view of a majority of jurisdictions," it was nonetheless compelled to construe section 1451(a) narrowly, explaining that "unlike other jurisdictions, where the Restatement merely serves as a summary of general legal principles for courts to accept or reject, the Virgin Islands has designated the Restatement as its law." *Id.* at 1387-88 (citing former

1 V.I.C. § 4). At the time *Monk* was decided, 1 V.I.C. § 4 was in force and the most recent Restatement to address the issue of assumption of risk was the Second Restatement, providing that a possessor could not be liable for an injury caused by a "known or obvious" danger. RESTATEMENT (SECOND) OF TORTS § 343A; *Monk*, 53 F.3d at 1384-85 ("Section 343A's focus on dangers 'known or obvious' to invitees, along with pertinent commentary, indicated it was intended as a variation on the doctrine of assumption of risk."). But since *Monk* was decided, the Legislature has effectively repealed 1 V.I.C. § 4 and its mandate to apply the Restatements by vesting this Court with the "supreme judicial power of the Territory," 4 V.I.C. § 21, which "includes the power to both interpret local law and modify the common law." *Banks*, 55 V.I. at 978. Therefore, the issue before this Court differs fundamentally from that before the Third Circuit in *Monk*, and this Court may examine the interplay between section 1451(a) and assumption of risk to determine the soundest rule for the Virgin Islands without "mechanistic and uncritical reliance on the Restatements." *Connor*, 60 V.I. at 602. Because the Third Circuit's decision in *Monk* represents the previously adopted rule, and we agree that this rule does "not represent the view of a majority of jurisdictions," *Monk*, 53 F.3d at 1385-86 & n.10, we now examine the most important factor: the soundest rule for the Virgin Islands.

The phrase "assumption of risk" has come to encompass two distinct concepts. The first concept — sometimes called express assumption of risk — involves situations where the plaintiff has absolved the defendant of its duty of care, either through "express contracts not to sue for injury or loss [or] situations in which actual consent exists such as where one voluntarily participates in a contact sport." *Blackburn v. Dorta*, 348 So. 2d 287, 290 (Fla. 1977). The second concept, implied assumption of risk, involves "an affirmative defense to an established breach of duty" where the plaintiff's actions demonstrate that she appreciated the risk involved and proceeded regardless of that risk. *Williamson v. Smith*, 1971 NMSC 123, 83 N.M. 336, 491 P.2d 1147, 1151 (1971); *see generally Tiller v. Atl. Coast Line R.R. Co.*, 318 U.S. 54, 68, 63 S. Ct. 444, 87 L. Ed. 610 (1943) (Frankfurter, J., concurring) ("The phrase 'assumption of risk' is an excellent illustration of the extent to which uncritical use of words bedevils the law."). In this case, the Superior Court held that regardless of Yacht Haven's negligence, Machado should have appreciated the risk of walking into a darkened parking lot. This is a textbook example of

implied assumption of risk. *See, e.g.*, *Smollett v. Skayting Dev. Corp.*, 793 F.2d 547, 548-49 (3d Cir. 1986) (granting judgment as a matter of law where the court could infer that the plaintiff "fully understood the risk of harm to herself and voluntarily chose to enter the area of risk. . . . implicitly assum[ing] the risk of injury"). So we limit this discussion to implied assumption of risk only, without commenting on express assumption of risk.

██ We conclude that maintaining implied assumption of risk as a complete defense to negligence conflicts with the Legislature's unambiguous directive in 5 V.I.C. § 1451(a) that the plaintiff's fault "shall not bar a recovery, but the damages shall be diminished by the trier of fact in proportion to the amount of negligence attributable to the plaintiff." Even though Virgin Islands courts must read statutes abrogating the common law narrowly, *Cascen v. People*, 60 V.I. 392, 404-05 (V.I. 2014), because implied assumption of risk is irreconcilable with the Territory's statutory comparative negligence scheme, maintaining it cannot be the soundest rule for the Virgin Islands and would undermine the policy set by the Legislature. *Perez*, 59 V.I. at 537 ("[Q]uestions of whether a party acted reasonably — which can defeat or mitigate liability — are issues of fact that must be decided by a jury.") (collecting cases); *see also Rini v. Oaklawn Jockey Club*, 861 F.2d 502, 508 (8th Cir. 1988) ("The adoption of comparative fault represents a legislative judgment that a plaintiff should not be denied recovery for injuries caused by a defendant's negligence simply because the plaintiff was partially at fault, although less at fault than the defendant.");[9] *cf. Chesterfield v. Henry*, 48 V.I. 432, 435 (D.V.I. App. Div. 2006) (holding that 5 V.I.C. § 1451(a) abrogates the

---

[9] *See also Kendrick v. Ed's Beach Serv., Inc.*, 577 So. 2d 936, 938 (Fla. 1991) ("The overlap [between assumption of risk and comparative negligence] is so great . . . that the doctrine of primary-implied assumption of the risk has been totally subsumed in the principle of negligence itself, and the doctrine of secondary-implied assumption of the risk has been merged into the principles of comparative negligence." (internal quotation marks and citations omitted)); *Blackburn*, 348 So. 2d at 292 ("We find no discernible basis analytically or historically to maintain a distinction between the affirmative defense of contributory negligence and assumption of risk."); *Rountree v. Boise Baseball, LLC*, 154 Idaho 167, 296 P.3d 373, 380 (2013) (adopting a comparative negligence system "creates a logical inconsistency with assumption of risk, which by definition bars recovery based on comparative responsibility"); *Jacobsen Constr. Co. v. Structo Lite Eng'g, Inc.*, 619 P.2d 306, 309-12 (Utah 1980) ("the reasonableness of plaintiff's conduct in confronting a known or unknown risk created by defendant's negligence" should be apportioned according to the comparative negligence statute) (collecting cases); Yasamine J. Christopherson, *The Rescue Doctrine Following the*

related common law doctrine of last clear chance). And despite the Third Circuit's holding in *Monk*, this Court has already rejected the argument that implied assumption of risk is a complete defense to be decided as a matter of law at summary judgment, reversing the Superior Court's grant of summary judgment in *Sealey-Christian* and holding that assumption of risk was ultimately a jury question. 52 V.I. at 427. As we recognized in *Sealey-Christian*, if there is evidence suggesting that a plaintiff's actions contributed to her own injury it must be presented to the jury, which may then allocate fault accordingly under section 1451(a). *Id.*; *see also Parrish v. Groathouse Constr., Inc.*, 2006 WY 33, 130 P.3d 502, 505 (2006) (after "adopting a comparative fault statute, . . . . [a]ssumption of the risk is now simply a form of contributory negligence relevant only to the apportionment of fault under the comparative negligence scheme").

██ Finally, this conclusion follows directly from the abolishment of the invitee, licensee, and trespasser status distinctions. Like the three status distinctions, the doctrine of assumption of risk is an ancient feature of the common law, with origins tracing back to fourteenth century England. Jane P. North, *Employees' Assumption of Risk: Real or Illusory Choice?*, 52 TENN. L. REV. 35, 38 (1984) ("The maxim *volenti non fit injuria*, a synonym for assumption of risk, first appeared in recorded English case history in 1305."). Even after its abolishment in England, American courts continued to invoke assumption of risk to insulate employers from liability in suits brought by injured employees — just as English courts once invoked the premises liability trichotomy to insulate feudal landowners from liability. *Tiller*, 318 U.S. at 58-59, 61 ("Assumption of risk is a judicially created rule which was developed in response to the general impulse of common law courts . . . to insulate the employer."); *see also Salinas v. Vierstra*, 107 Idaho 984, 695 P.2d 369, 372 (1985) ("The doctrine, in effect, gave maximum legal immunity to

---

*Advent of Comparative Negligence in South Carolina*, 58 S.C. L. REV. 641, 644-45 (2007) ("The last clear chance doctrine, recklessness, and assumption of risk have been supplanted by comparative negligence in almost all jurisdictions."); Mark W. Milam, Comment, *Assumption of Risk in Tennessee Subsequent to the Adoption of Comparative Fault:* Perez v. McConkey, 60 TENN. L. REV. 1007, 1010 (1993) ("Most comparative fault jurisdictions either abolished the doctrine or absorbed it into their comparative fault scheme."); Victor E. Schwartz, *Toward Neutral Principles of Stare Decisis in Tort Law*, 58 S.C. L. REV. 317, 331 (2006) ("[C]ourts have changed assumption of risk from a complete defense to a factor in assessing proportionate fault. A defendant's liability is reduced to the extent that a plaintiff assumed the risk at issue in the case.").

industry."). And like the trichotomy, assumption of risk has served as simply another way to prevent a plaintiff's claims from getting before a jury. *See Nelson*, 507 S.E.2d at 887 (concluding that "the trichotomy was created to disgorge the jury of some of its power"). This Court's jurisprudence has consistently favored — wherever possible — the adjudication of negligence cases by a jury, a preference codified by the Legislature in 5 V.I.C. § 1451(a), instead of by a single judge at summary judgment, and there is no cogent reason to break from this legislative and judicial policy here.

 Accordingly, because Machado presented evidence that would allow a reasonable jury to find that the sprinkler heads were not functioning properly for an amount of time sufficient to give Yacht Haven notice of a dangerous condition, and that there was insufficient lighting in the parking lot in the area of her fall, the Superior Court erred in granting summary judgment to Yacht Haven. To the extent there is evidence that Machado was negligent in entering the median to reach her car in the parking lot — and Yacht Haven properly raises this defense — the jury must apportion fault between the parties under 5 V.I.C. § 1451(a).[10]

## IV. CONCLUSION

We conclude that extending our holding in *Perez* — that the foreseeability of harm "is the touchstone of the existence of [a land possessor's] duty of reasonable or ordinary care" — to all premises liability actions is the soundest rule for the Virgin Islands. Additionally, the Superior Court erred in holding as a matter of law that Machado had assumed the risk of her actions in entering the median, as the extent to which Machado contributed to her own injuries is a determination the jury must make under the comparative negligence statute. Therefore, because Machado presented sufficient evidence to create genuine issues of material fact regarding the foreseeability of her presence in the median

---

[10] Machado also argues that the Superior Court "erroneously ignored" her request for a spoliation inference due to Yacht Haven's failure to preserve the surveillance footage of her fall, and that a reasonable jury could find that the median created a dangerous condition by "dissect[ing] the most logical and safest points of ingress and egress" from the complex to the far side of the parking lot. But because we reverse and remand on other grounds, we do not reach these arguments.

and Yacht Haven's notice of a dangerous condition, we reverse the Superior Court's November 16, 2012 order granting summary judgment to Yacht Haven and remand for further proceedings.